In the Matter of **HARDWICK & MAGEE COMPANY, Bankrupt.**

No. 71–753.

United States District Court,
E. D. Pennsylvania.

Feb. 6, 1973.

Adelman & Lavine, Nathan Lavine, Philadelphia, Pa., for receivers.

Kip D. Denega, Jr., Philadelphia, Pa., for Langhorne Carpet Co.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

This case raises important questions as to the proper criteria to be applied in determining fees to be awarded to attorneys for receivers and trustees in Chapter XI and straight bankruptcy proceedings. The principal questions involved are the following: *First*, should "time spent" by counsel be a prime consideration in determination of fees; *Second*, must the referee distinguish between the legal and non-legal services of counsel in determining fees; and *Third*, may the referee refer to statistical averages pre-

pared by the Administrative Office of the United States Courts as a guideline.

The matter comes to us on the petition of Langhorne Carpet Company (Langhorne), a general creditor of Hardwick & Magee Company (the Debtor),[1] for a certificate of review [2] of the Order of the referee awarding counsel fees to: (1) counsel for the operating receivers of the Debtor when it was a Chapter XI debtor; (2) counsel for the liquidating receivers of the Debtor after it had been adjudicated a bankrupt; and (3) counsel for the trustee in bankruptcy.[3]

Needless to say, the referees in this, as in all districts, regularly determine counsel fees [4] and have formulated their own practices in such matters. The referee's certificate on petition for review in this case states that the referees in this district do not consider "time spent" (as opposed to other considerations) to be a prime consideration in Chapter XI (in contrast with Chapter X) proceedings. Indeed, the supplemental memorandum filed by receivers' and trustee's counsel in opposition to the certificate of review represents that the policy of ignoring time spent as a criterion in determining fees in Chapter XI and straight bankruptcy proceedings has been in existence for over forty years in our local (Eastern District) bankruptcy court. The referee's certificate also indicates to us that the referees in this district may not deem it necessary to distinguish between the legal and non-le-

---

1. Although the debtor was subsequently adjudicated a bankrupt, so that there may be uniformity of reference, we refer to it as the "Debtor" rather than the "bankrupt" throughout.

2. Section 39 of the Bankruptcy Act, 11 U.S.C. § 67, provides that any person aggrieved by an order of a referee may file a petition for review by the bankruptcy court, 11 U.S.C. § 67(c) and the referee must make certificates on petitions for review of his order, 11 U.S.C. § 67(a).

3. The law firm of Adelman and Lavine was appointed counsel for the operating and liquidating receivers. After the adjudication, Wexler, Weisman, Maurer and For-

man Esquires were appointed together with Adelman and Lavine, Esquires as counsel for the trustee. Thereafter, the two firms participated in the representation of the trustee. In order to avoid any question of duplication of compensation for the same services, the application of the two firms for compensation as counsel · for the trustee was based solely on the services rendered by Adelman and Lavine. The two law firms involved possess long experience in bankruptcy matters, perhaps more than any other firms practicing in this district. Both firms have joined in the Brief Contra Certificate of Review.

4. *See* § 38(b) of the Bankruptcy Act, 11 U.S.C. § 66.

gal services of counsel, and that they do refer in at least some measure to the statistical averages in determining fees. Langhorne's vigorous exception to these practices and to the referee's approach gives rise to the recitation of facts and discussion which follow.

## II. *A Capsule History of the Debtor and the Proceedings*

The Debtor was one of Philadelphia's vintage firms, having been founded as a sole proprietorship in 1837 and continued thereafter as a partnership until its incorporation in 1910. The Debtor was engaged in the business of the manufacture and sale of carpeting at wholesale and retail as well as the sale at retail of rugs and furniture. It maintained wholesale showrooms in Chicago, Detroit, Los Angeles, San Francisco, New York, and Philadelphia for the display and sale of its carpets and rugs at wholesale and also operated eight retail outlets in the Philadelphia area. Shortly prior to the Chapter proceedings, the manufacturing operations had been discontinued, the wholesale showrooms had been closed, and the eight retail outlets had been reduced to four, located at 620 W. Lehigh Avenue, Philadelphia, 1207 Chestnut Street, Philadelphia, Ashland Terrace, Cherry Hill, N.J. and 874 Baltimore Pike, Springfield, Pennsylvania.

At the time the Chapter XI proceedings were instituted, the Debtor was solvent, and had, according to its books, a net worth of over $650,000. However, during the five months preceding the filing of its petition on October 26, 1971, it had suffered an operating loss of $500,000. Moreover, the Debtor's real estate and accounts receivable and, in a limited amount, its inventory, were pledged as collateral to the Girard Bank to cover loans aggregating $572,628. At the time of the filing of its petition, the debtor had no working capital and no cash to finance its operations. While for many years the Debtor had enjoyed an excellent reputation in this area as a retailer of quality rugs, carpeting, and furniture, and its sales for the five

months preceding bankruptcy were in excess of $60,000, these had substantially declined from prior periods by reason of its inability to finance manufacturing operations and purchases of furniture, rugs, and carpeting for resale.

The Chapter XI petition was filed on October 26. Pursuant thereto, this Court appointed operating receivers who, with the aid of counsel, attempted to obtain financing and to keep the Debtor alive so as to reorganize it. The operating receivers continued the business of the Debtor until December 13, 1971, at which time they were advised by counsel that further operation of the business was not warranted in view of continuing losses. On December 16, 1971, the Debtor was adjudicated a bankrupt. The operating receivers became the liquidating receivers and one of them subsequently became the trustee in bankruptcy. With the exception noted above (see note 3), counsel remained the same throughout. The bulk of the assets of the Debtor, including real estate, inventory, and accounts receivable has been liquidated (the liquidation is still continuing).

At the time of audit of the operating receiver's account (October 3, 1972), the referee acted upon the fee applications of counsel as follows:

(1) he approved the application of counsel for the operating receivers for a fee of $10,000;

(2) he approved the application of counsel for the liquidating receivers for a fee of $5,000;

(3) he considered the application of counsel for the trustee in bankruptcy for a fee in the sum of $52,500, and he allowed the fee in the sum of $47,500. Langhorne's objections to the fees were made at the time of audit, and have been renewed in this appeal.

## III. *The Services Rendered by Counsel*

In connection with their applications for compensation, counsel submitted to the referee a detailed list of the items of legal work performed by them. They

have expounded upon that list in their Memorandum Contra Certificate of Review ("counsel's memorandum") and have also supplied us with a copy of the referee's docket entries. No evidence of any kind was afforded to the referee of the amount of time expended in performing these services. As garnered from their submissions, the nature of counsel's services and the results obtained may be summarized as follows:

A. *Counsel for the Operating Receivers*

In addition to counseling the operating receivers as to their duties and responsibilities throughout (said to be on a daily basis), counsel's principal activities consisted of the following:

1. Preparing the Petition for Appointment of the Receivers and Counsel and processing and filing the receivers' bond.

2. Negotiating a loan with Girard Bank to enable the receivers to meet payroll (and preparing the certificates of indebtedness and the petition seeking leave to borrow).

3. Preparing petitions for appointment of an accountant and for leave to employ certain officers of the debtor; also instructing the accountants as to audits required.

4. Consulting with persons interested in implementing a plan of arrangement.

5. Filing other miscellaneous petitions (for leave to borrow other sums, for leave to reject certain burdensome executory contracts), and attending hearings on such matters.

6. Defending certain reclamation petitions including, in one instance, an appeal to this Court; briefs were involved in "several" cases.

7. Assisting in the negotiations for the private sale of certain stock owned by the Debtor, as well as preparing and filing the petition authorizing the sale and handling the settlement for same.

8. Negotiating with Debtor's counsel for the filing by the Debtor of its consent to be adjudicated a bankrupt.

9. Attendance at a meeting of the Creditors' Committee in New York City.

Our independent review of the docket entries reflects some 15 orders entered by the referee which were in response to the filing of petitions by counsel for the operating receivers. We feel constrained to note that most appear to be routine in nature, at least for experienced bankruptcy counsel.

Counsel's memorandum represents that the comprehensive program of representation of the Debtor "involved constant daily attention by the two senior partners of the firm and assistance, on the part of one and sometimes two other partners." Characterizing the nature of those services, that memorandum further observes:

Counsel for the receivers believe that their request for compensation in the amount of $10,000 . . . was fair and reasonable in view of the size of this estate and the complex problems presented in the attempted preservation of the business of the debtor and in the preservation of its assets. The responsibility placed upon counsel for the receivers was substantial inasmuch as they were obliged to participate in negotiations with the debtor, the secured creditor and with others. Counsel for the receivers are experienced in arrangement, reorganization and bankruptcy proceedings having devoted themselves largely to this specialty over a period exceeding forty years for one of the senior partners and a period exceeding twenty years for another of its senior partners. In this case, counsel for the receivers were obliged to and did devote their best efforts and their expertise acquired over many years of experience in the solution of the problems presented by the operating receivership.

Apparently in view of the failure of the arrangement proceedings, no reference in support of fee is made to the results obtained by counsel's services to the operating receivers, which extended from October 26, 1971, to December 15, 1971.

**B.** *Counsel for the Liquidating Receivers*

The services of counsel for the liquidating receivers extended from December 16, 1971, to February 2, 1972, when one of the receivers was elected sole trustee. According to their filed papers, the principal activities of counsel during the period, in addition to conferring from time to time with the receivers, consisted of the following:

1. Counseling the receivers with respect to the difficult decision as to whether to sell the Debtor's principal piece of real estate located at 620 W. Lehigh Avenue, Philadelphia, a complex of multi-story buildings comprising 326,000 square feet of floor space.

2. Negotiating with persons making offers to purchase the real estate at private sale.

3. Negotiating the private sale of the Debtor's trade name and preparing a petition for leave to complete the sale and attending a hearing thereon (this petition was intially denied by the referee).

4. "Assisting the receivers in the opening of their bank accounts and in connection with the telephone service."

5. Attending a creditors' meeting in New York City.

6. Conferring with the auctioneer with respect to certain sales.

7. Assisting in connection with the filing of the inventory and preparing and filing the receivers' operating and liquidating accounts.

8. Preparing and filing various miscellaneous petitions (for compensation, for appointment of an appraiser, etc.).

9. Responding to various inquiries from creditors, employees of the debtor, prospective purchasers of assets, and other parties in interest.

10. Setting up of files and a system for collection of some 1100 individual accounts receivable, writing demand letters, and handling hundreds of telephone calls in connection with collection.

In their Memorandum Contra Certificate of Review, counsel refer to the $5000 award of fees to counsel for the liquidating receivers as "nominal."

**C.** *Counsel for the Trustee*

The services of counsel for the trustee are still continuing. We consider however only those services rendered up to the time of filing the Petition for Compensation.

According to the petition and memorandum, the most substantial services performed during the period of trusteeship were those attendant to collection of the accounts receivable. Apparently the full responsibility for collecting these accounts was assumed by counsel. With two members of counsel's firm in charge of collection, at least 4000 form letters were written, generating a large flow of responses and telephone calls from account debtors. The sum of $163,794 was in due course collected. Counsel has noted that, at commercial law league rates, the fees on this collection would exceed $21,000.

The second principal effort during the trusteeship period involved the examination of the 392 proofs of claim filed by creditors, the filing of written objections to some 59 claims, and the attendance at hearings on the objections. Counsel submits that as the result of their efforts, the claims of creditors will be reduced by some $1.1 million, thus doubling the distribution to creditors whose claims are allowed.

Other services during the trusteeship period include the following:

1. Attending the first meeting of creditors.

2. Attending the public sale of real estate, trade name, inventory, and equipment of the Debtor, which yielded the gross sum of $560,475 and extended over a period of four days.

3. Preparing petitions for confirmation of the asset sales and attending hearings thereon.

4. Settling the claim of the purchaser of the real estate who objected to confirmation of the sale of the heavy machinery.

5. Preparing the deed and attending the real estate settlement.

6. Negotiating with Girard Bank with respect to its secured claims.

7. Preparing and filing certain miscellaneous petitions (for the trustee to hire clerical help, for the employment of special counsel in New Jersey to collect an account, to invest cash funds in ninety day certificates of deposit, for compensation, etc.), and the trustee's first report.

The public sale of the assets of the Debtor resulted in a realization of $347,181.44 for the inventory; $18,000.00 for the trade name; $4,960.75 for the sale of equipment; and $190,000.00 for the sale of the real estate. The total amount collected by the trustee to the date of his accounting (May 11, 1972) was $825,225. In the view of counsel:

> Here, a company having thousands of customers, hundreds of creditors and many employees suddenly closes its doors. The trustee and his counsel are obliged to deal with thousands of inquiries, demands and claims all without the benefit of the bankrupt's organization or familiarity with its records. The trustee and his counsel are suddenly substituted for all of the bankrupt's officers and employees. Voluminous files must be set up and managed. Hundreds of details must be dealt with.
>
> . . . . . .
>
> In view of the amounts involved in these proceedings, the complexities of the problems involved, the benefit obtained for the bankrupt estate in the maximum realization of assets, the compensation allowed by the Referee to counsel for the operating receivers, the liquidating receivers and the trustee were fair and reasonable . . . ."

(Memorandum Contra Certificate of Review, at 14, 16.)

### IV. *The Findings of the Referee*

The referee made no findings as such and wrote no opinion giving his reasons for the allowances. However, in his Referee's Certificate on Petition for Review, he appended a statement of reasons.

The referee first adverted to the well known formulation in *Collier* (see *infra*) on the subject of determination of counsel fees:

> The law is clear that "In determining the reasonable value of services rendered by an attorney the following elements are to be considered: the time spent, the intricacy of the problems involved, the size of the estate, the opposition met, the results achieved, all subject to the economical spirit of the Bankruptcy Act.
>
> . . .

3A Collier on Bankruptcy ¶ 62.12, at 1491. However, he then went on to state:

> Counsel for the petitioner on review confuses applications for counsel fees in Chapter X proceedings (which, in some jurisdictions regard "hours employed" as an important element in gauging the worth of attorneys' services), and applications for counsel fees in Chapter XI or liquidation proceedings, *which do not regard "hours employed. . . ."* (emphasis added).

In declaring that he considered the counsel fees to be reasonable the referee stated that the case had been before him since its inception and that he knew the intricacies of the many problems confronting counsel for the operating and liquidating receivers and counsel for the trustee, adding:

> All of them are referred to in counsels' petition for fees; they need not be spelled out. I know the results achieved; the docket gives tacit affirmation to my recollection.

In determining the fee, the referee also took into account that the services rendered by counsel extended over a period of many months and that the counsel fees totaled only slightly over ten percent of the total receipts of the operating and liquidating receivers and trustee. While it is not completely clear whether it formed a basis for his deci-

sion, the referee added language to the effect that the counsel fees and other costs of administration allowed by the Bankruptcy Court for the Eastern District of Pennsylvania are among the lowest such awards for metropolitan areas in the latest report of the Administrative Office of the United States Courts. Noting that the "economical" spirit of the Bankruptcy Act is not to be considered synonymous with "parsimonious," he urged the importance of not discouraging able and competent lawyers from practicing in the Bankruptcy Court by denying them reasonable compensation.

In a letter addressed to the Court after the filing of the certificate of review, the referee made some additional observations as to the importance of time spent by counsel:

> I should say, in passing, that while I give some weight, in determining an attorney's fee, to the time spent by counsel, I have never considered it to be a major element. It has always seemed to me, to do so, could be putting a premium on slowness and a lack of knowledge, at the expense of an attorney who grasps a problem quickly and whose comprehension of the problem and the applicable law enables him to solve that problem quickly.

## V. *The Scope of Review of the Referee's Order*

 General Order 47 provides that the judge shall accept the referee's findings of fact unless they are "clearly erroneous." This principle is to be applied whenever the referee's factual findings are attacked on review. *See* Schapiro v. Tweedie Foot Wear Corp., 131 F.2d 876 (3d Cir. 1942); In re Lux's Superette, Inc., 206 F.Supp. 368 (E.D.Pa.1962).

A somewhat different rule obtains where what is at issue is a referee's ultimate finding. Such a finding may be reviewed free of the "clearly erroneous" result, although the court cannot reverse if there is a reasonable basis in the record for the finding. In the Matter of the Arbycraft Co., Debtor, 288 F.2d 553 (3d Cir. 1961). The "clearly erroneous" rule also does not apply where the reviewing court is in as good a position as the referee to construe the terms of a written instrument, no credibility judgments being involved. Adler v. Nicholas, 381 F.2d 168 (5th Cir. 1967); Bass v. Quittner, Stutman & Treister, 381 F. 2d 54 (9th Cir. 1967). Finally, and apposite here, the "clearly erroneous" standard for judicial review applies only to the bankruptcy referee's findings of fact, and the court is not bound by the referee's conclusions of law if they are found to be erroneous. In the Matter of Christian and Porter Aluminum Company, Bankrupt, 316 F.Supp. 1340 (N.D. Cal.1970). Put differently, findings of fact of bankruptcy referees may be considered clearly erroneous if they are based upon substantial error in proceedings or upon misapplication of controlling law. In re Gilbert's Hotel, Inc., 305 F.Supp. 898 (S.D.N.Y.1969).

## VI. *Discussion*

### A. *The General Principles Applicable to Determination of Bankruptcy Counsel Fees*

 In discussing arrangement or bankruptcy proceedings of any size or significance, it is probably fair to say that no two such proceedings are the same in terms of the problems presented or the manner of their resolution. Accordingly, the allowance of fees to counsel depends largely upon the facts of the individual case. Since the elements determining the amount of an allowance are many, it would be impossible to formulate any rigid set of rules that would permit mechanical calculation of counsel fees in every case. Indeed, as Professor Moore has observed,[3a] decisions as to the amount of allowance as such have little value as precedent. Accordingly, the courts have established certain general guidelines (Congress has not attempted to deal with this problem), leaving dis-

---

3a. 3 Collier on Bankruptcy § 62.12[5], at 1489.

cretion in the referee or judge to deal with specific problems as they arise.

The most frequently quoted statement of the principles governing such allowance is found at 3 Collier on Bankruptcy § 62.12 [5], at 1489:

> *Economy is the most important principle*, as has been repeatedly stressed by the United States Supreme Court. . . . However, "economical" is by no means synonymous with "parsimonious" and should not exclude a compensation that is under all the circumstances of the case fair and reasonable. To reserve as much as possible for distribution to the creditors is one postulate, but there is another, perfectly compatible with the former, not to discourage needlessly able and competent lawyers from accepting a retainer in bankruptcy by denying them reasonable remuneration. . . .
>
> . . . . . .
>
> *In determining the reasonable value of services rendered by an attorney the following elements are to be considered:* "the time spent, the intricacy of the problems involved, the size of the estate, the opposition met, the results achieved,—all subject to the economical spirit of the Bankruptcy Act." . . . (footnotes omitted, emphasis added).

In the Matter of the Roustabout Company, Bankrupt, 386 F.2d 354 (3d Cir. 1967), was a case in which the Third Circuit was confronted with a challenge of the fee awarded to the attorney for the receiver and trustee in bankruptcy. At the final meeting of creditors, the referee reduced the attorney's fee from $20,000 to $15,500 and the reduced fee was approved by the district court. In modifying the district court's decree, and reducing counsel fee to $10,000, the Court of Appeals stated:

> *The elements to be considered in awarding an attorney's fee in bankruptcy matters include the time expended, the difficulty of the problems encountered, the results achieved, and the size of the estate. . . . Fees to court officers should also be evaluated with a principle of economy in mind. . . .*

We have carefully considered this fee award in light of the criteria enumerated above and are of the opinion that it is excessive. We find no fault with the performance of the attorney for the receiver and trustee. The size of the fee, however, is very substantial when compared with the amount available to creditors and the nature of the work performed. An analysis of the services rendered does not reveal an abundance of difficult legal problems. Many of the services could be considered ministerial. There was no litigation. *In addition, although the attorney stated that he expended in excess of 400 hours working on this estate, this was not supported by specific time records.* It is our judgment that a fee of $10,000 would be entirely adequate under these circumstances and the order of the District Court will be modified accordingly. (citations omitted, emphasis added).

A similar formulation of the applicable general principles is found in Jacobowitz v. Double Seven Corp., 378 F.2d 405 (9th Cir. 1967):

> The court in a given case fixes the fee after a consideration of various elements, which the referee's order correctly states as follows:
>
> " * * * the size of this estate and the proportionate amount thereof recovered through the efforts of petitioner, the time expended by him in dealing with the matters involved, his ability and experience, the difficulty and intricacy of the legal propositions determined, the skill employed by petitioner, the opposition met, the opinions evidenced touching the reasonableness of the fee requested, all in the light of the limitation of the 'economical spirit of the Bankruptcy Act' and the to-

tal costs incurred in the administration of the estate as related to the size thereof, * * * "

In terms of the instant case, there is no dispute that, with the exception of time spent, all of the factors enumerated in *Collier* and in *Roustabout* and *Jacobowitz* are significant for consideration. Indeed, the referee's emphasis on results achieved is in consonance with *Collier's* comment that "[i]n view of the primary purpose of bankruptcy liquidation it is not surprising to find that, aside from the principle of economy, the results achieved constitute the factor of greatest determinative weight." 3 Collier on Bankruptcy § 62.12 [5], at 1491–92.[5] We must come to grips in this case with the question whether time spent is an important factor in determining fees in this type of matter; counsel for the receivers and trustees submit that it is not, but petitioner contends that it is. As noted above, the facts also require us to examine the questions of: (1) the extent to which the referee must distinguish between legal and non-legal services of counsel in determining fees; and (2) the appropriateness of considering the statistical average compiled by the Administrative Office of the United States Courts as a fee guideline. Hence, we shall put aside the matters about which there is no dispute, and shall deal with the points just mentioned and several related matters.

B. *The Importance of Time Spent*

█ It has doubtless been noted that time spent is the first consideration mentioned in the Third Circuit's *Roustabout* formulation of factors to be considered in determining fees. It is also the first consideration mentioned in the oft quoted passage from *Collier*. It would be overly simplistic to conclude that the criterion mentioned first is necessarily the most important; however, the first-mentioned criterion should not be facilely jettisoned altogether. What is more important is that the *Roustabout* holding enunciates the rule for this circuit

that time spent is a prime consideration in determining counsel fees in matters before the referee. Moreover, *Roustabout* makes no distinction between Chapter X and other bankruptcy proceedings. Thus, the referee's legal conclusion that "time spent" is not a prime factor for consideration was in error.

Our Court of Appeals has also been concerned with time spent by counsel in Chapter X proceedings, *see, e. g.,* In re Imperial "400" National, Inc., 432 F.2d 232 (3 Cir. 1970). In that case, Judge Van Dusen discussed certain aspects of the general fee determination principles:

Special note should also be made of the offered explanation of time spent by the trustee and his attorney. Although the SEC had access to at least the attorney's time sheets, only a total hourly listing was supplied to the court. Neither the District Court, nor this court in reviewing the record on appeal, can be expected to render an appropriate decision in the absence of adequate time records. In re Roustabout Co., 386 F.2d 354 (3rd Cir. 1967); In re Wal-Feld Co., 345 F.2d 676 (2nd Cir. 1965). While minute detail should not be required in an interim application, there is nothing in the record from which a court could estimate how much work was productive or necessary, how much work required treatment by experienced attorneys, or to what extent the services rendered were duplicative. It may also be possible that time not legally compensable, such as that spent in applying for or in defending interim fee awards or in travelling to the offices of the debtor, was included in the accounting. Furthermore, the assumption that the trustee or his attorney are entitled to fees normally charged private clients is unwarranted. Surface Transit, Inc. v. Saxe, Bacon & O'Shea, *supra,* 2 Cir., 266 F.2d 862, at 865; London v. Snyder, *supra,* 8 Cir., 163 F.2d 621, at 625. Compare United States v. Larchwood Gardens, Inc.,

5. This view, however, is not apparently the law in this circuit.

*supra*, 3 Cir., 404 F.2d 1108, at 1114 (equity receivership). (footnotes omitted).

It will be noted that in the quoted passage Judge Van Dusen cites *Roustabout* as authority, underscoring the fact that there is no difference in the standards for determining counsel fees between Chapter X and other types of bankruptcy proceedings.

The citation by Judge Van Dusen of In the Matter of Wal-Feld Company, Inc., Bankrupt, 345 F.2d 676 (2d Cir. 1965), is also significant. *Wal-Feld* was a Chapter XI proceeding. There, counsel for the trustee, who had requested a fee of $25,000 for services rendered, appealed from an order of the District Court confirming the allowance of only $11,000 for those services by the referee. The $25,000 fee request was based upon an alleged 1150 hours of work on the trustees behalf, but the Court of Appeals found that the record did not offer any of the detail necessary to value either the amount of time expended or its value. In affirming the District Court, the Court of Appeals made applicable to Chapter XI proceedings its Chapter X rule, and noted:

> The petition for an allowance submitted by Goldman & Frier consists almost entirely of a general description of their services, principally the initiation and settlement of three suits. The sole reference to the time devoted to this work is the statement that one of the partners "expended a total of 750 hours and [his] associates \* \* \* expended a total of about 400 hours." If daily time records were kept, this fact does not appear.
>
> We recently held that a law firm was not entitled to the full amount which it sought for its services to the trustee in bankruptcy because the firm had failed to keep adequate time records. In re Hudson & Manhattan RR. Co., 2 Cir., 339 F.2d 114 (1964). The records kept in that case were incomparably more detailed than anything which appears on the record now before us, and the warning which

we then gave is even more appropriate here:

> "[A]ny attorney who hopes to obtain an allowance from the court should keep accurate and current records of work done and time spent. Lawyers are well aware that, especially where services of the nature here involved are spread over a period of time and ultimate payment is virtually assured, they are valued principally on the basis of the time required. There is no excuse for an established law firm to rely on estimates made on the eve of payment and almost entirely unsupported by daily records or for it to expect a court to do so." Id. at 115. (emphasis added).

In commenting upon results achieved, the Court added:

> The appellants point to the fact that $59,000 of the approximately $83,000 received by the trustee came from the three settlements which they obtained. That they thus enriched the estate and did so without extensive litigation is of course commendable. *However, their success did not entitle them to support their request for an allowance with nothing more than a bare statement of the total hours worked in such round figures that it is apparent that they are an estimate made many months after the event.* (emphasis added).

In the Second Circuit, it thus appears that time spent is the dominant consideration in determining fees. *See also* In re Mabson Lumber Co., 394 F.2d 23 (2d Cir. 1968). And it is apparent from the cases from the Seventh and Tenth Circuits that time spent is considered a major criterion in determining counsel fees in non-Chapter X proceedings. *See* Meissner Engineers, Inc. v. Thomas, 421 F.2d 12 (7th Cir. 1970); Girsh and Rottman v. Katchen, 382 F.2d 560 (10th Cir. 1967).

That the courts should consider time spent to be at least one significant factor in determining fees is not surprising. The Code of Professional Respon-

sibility recently adopted by the American Bar Association addresses the general issue as follows in Section DR 2–106 ("Fees for Legal Services"):

> (B) Factors to be considered as guides in determining the reasonableness of a fee include the following:
>
> (1) *The time and labor required,* the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

. . . . . .

And the Code's predecessor, the Canons of Ethics, provided at Canon 12 ("Fixing the Amount of the Fee"):

> In determining the amount of the fee, it is proper to consider: (1) *the time and labor required,* the novelty and difficulty of the questions involved and the skill requisite properly to conduct the cause . . . (emphasis added).

In view of the foregoing discussion, we conclude that the proper rule in all types of bankruptcy proceedings is that the referee must consider time spent as an important criterion in determining fees. It is not the sole criterion; matters such as the difficulty of the problems encountered, the opposition met (see discussion as to "quality" of time spent, *infra*), the size of the estate, and the results achieved must also be considered, all with the principle of economy in mind.[5a] There are perhaps few judicial determinations more sophisticated or indeed more difficult than the determination of a fee award. Since such a determination summons the acme of the referee or judge's art, it cannot be firmly controlled by given guidelines. Indeed, these considerations account for the wide latitude accorded referees' fee determinations by virtue of the limited scope of judicial review.

In this case, no record of any kind was developed on time spent. The referee asserted in his certificate that he did not consider time spent in fee awards in Chapter XI proceedings and amended that statement only to state that he accords it small weight. In view of the correct legal standards, the referee's decision in this case was based on an erroneous interpretation of law and must be reversed and the matter remanded for further consideration in light of this Opinion.[6] It would be well,

---

5a. The matter of the expertise and ability of counsel, noted in *Jacobowitz, supra* as a factor to be considered in the fee award is not mentioned in *Roustabout.* However, that expertise and ability would ordinarily be reflected by, and therefore considered under, "results achieved."

6. We do not read this Court's Special Bankruptcy Rule X–13 as conflicting with the views expressed herein. That rule provides as follows:

Rule X–13 Applications for Compensation and Allowances—Contents—Notice

Every application for compensation or allowances shall be verified and shall include (a) a detailed statement of the services rendered and expenses incurred; (b) the amounts separately stated, for which an allowance is sought as compensation and as reimbursement; (c) a copy of the statement, if any, filed by the applicant pursuant to Section 211, if any, up to date; (e) a detailed statement of the facts required to be stated by the applicant under Section 249 of the Bankruptcy Act; (f) a statement by the applicant that he has not entered into any agreement, written or oral, expressed or implied, with the debtor, receiver, trustee, or any other party in interest, or any attorney of any such persons, for the purpose of fixing the amount of any of the fees or other compensation to be allowed out of or paid from the assets of the debtor; and (g) such other facts as may be necessary to reveal fully the applicant's connection with the proceeding and with the debtor, receiver or trustee and the parties in interest.

Where a proceeding under Chapter X is superseded by an adjudication and liquidation in bankruptcy, all applications for compensation for services rendered in the Chapter X proceedings shall be filed with the judge and referred to the referee as special master to pass thereupon and make his report to the judge. Notice of hearing on such applications shall state the names of the applicants, the several capacities in which they have acted and the amounts,

at this juncture, to add as a further refinement of the proper rule what the Second Circuit in effect held in *Wal-Feld, supra;* results achieved, no matter how good, will not support an award without consideration of time spent as well, and the demonstration of some reasonable nexus between the two.

 There are certain related considerations which require mention, for the evaluation of time spent is not merely a matter of reading the ticking meter. The *quality* of the time spent must also be considered, and that includes the questions whether: (1) the services were merely ministerial in nature, *see Roustabout, supra;* (2) the services were routine or, on the other hand, required the application of special resourcefulness and skill; and (3) such aspects of counsel's work as involved litigation were opposed or unopposed.

We note that an inspection of the docket entries with respect to the various petitions filed by counsel indicates that most of them were routine. With the exception of the reclamation proceeding involving Langhorne, which was litigated before us, it does not affirmatively appear from the record that any of the proceedings before the referee was contested. While counsel's memorandum implies that great effort has been expended in connection with objections to proofs of claim, including careful inspections to eliminate duplicate claims, negotiations to settle disputed claims, and proceedings as to those which could not be settled, we cannot glean from the present record the quality of effort involved. Were the claims which counsel succeeded in eliminating or reducing patently overreaching, hence easily dealt with, or was tough negotiation or litigation involved? These considerations are also relevant on the subject of results achieved, · which is obviously a principal ingredient in the referee's award. While Langhorne's counsel has argued that "nothing extraordinary" was accomplished, counsel for the receivers and trustee have represented that the results achieved by their services were dramatically beneficial to the estate.

 Our observations as to the nature of the petitions filed by counsel and as to the extent that proceedings before the referee were contested are impressions only, since the docket does not comprehend a substantive description of each proceeding. In any event, the referee made no findings on the quality of time spent as we have explained that notion. That is an additional reason why the referee's decision was erroneous and must be remanded to him so that an appropriate record may be developed and the fee redetermined in accordance with the standards enunciated herein.[7]

---

separately stated, sought by each for the compensation and for reimbursement.

Counsel argues that time spent is not cognizable because Rule X–13 does not specify that a statement of time spent must accompany applications for compensation. Counsel misapprehends the purpose of the Rule, for it does not purport to be a statement of criteria to be applied in determining fee. We note, however, that a statement of time spent would certainly come within the ambit of (a) of the Rule.

7. On remand, the referee must consider the admonition of Judge Van Dusen in *Imperial 400 National, Inc., supra:* "the assumption that the trustee or his attorney are entitled to fees normally charged private clients is unwarranted."

*Collier* also notes that:

Another application of the Economy Principle is to be seen in the rule that attorney fees in bankruptcy liquidation should not approximate what private clients are expected and want to pay for similar services.

To the same effect is the decision of the Second Circuit in In re Mabson Lumber Co., 394 F.2d 23 (2d Cir. 1968), where it was stated:

Attorneys' fees in bankruptcy liquidation are governed by "the economical spirit of the Bankruptcy Act," and the amounts which "private clients are expected and wont to pay for similar services" are not determinative.

The foregoing recitals tacitly recognize that bankruptcy administration is a public, not a private, matter, and that, because administrative expenses including counsel fee, can markedly affect the amount the

## C. The Necessity of Distinguishing the Legal and Non-Legal Services of Counsel

In his memorandum to the Court, Langhorne's counsel has laid great emphasis upon a number of items listed by receivers' and trustee's counsel in their several petitions for compensation which he contends are non-legal in character, and he vigorously asserts that counsel are not entitled to compensation for those services. He adverts particularly to matters such as assisting the receivers in the opening of their bank accounts, assisting the receivers in connection with the telephone service, processing the bond, responding to inquiries from employees of the Debtor and prospective purchasers of assets, some of the many negotiations engaged in by counsel, and perhaps even conferring with the auctioneer.

Some of these matters are not legal in character. However, although we must address the question thus raised, these services may not have been sufficiently time-consuming or important to make a difference in the ultimate determination of fee. Moreover, from time to time all lawyers are called upon to perform duties for their clients which do not require the application of legal skills, and where it is necessary that they perform them, they should be entitled to compensation. The question of compensation for non-legal services is of principal importance not because of the performance of certain ministerial duties by counsel, but because of claims by Langhorne that counsel are not entitled to compensation for their services in connection with negotiations and with collecting accounts receivable.

Turning first to the question of negotiations, this record indicates that counsel for the receivers and trustees took over the responsibility for negotiation of all the principal transactions involving the Debtor's and bankrupt's estate. More specifically, counsel apparently handled such matters as negotiating loans with the bank, selling all of the Debtor's many assets, and negotiating with the Debtor's many creditors as to terms and with persons proposing a plan of arrangement. Such negotiations can obviously consume large amounts of time. They also engender the question of allocation of fee, which in turn involves the matter of the ultimate cost to the Debtor's or bankrupt's estate. This is because receivers and trustees are compensated on a commission basis;[8] hence, additional services by a receiver or trustee do not increase the cost to the estate, whereas when an attorney performs and is compensated for services which should be performed by a receiver or trustee, he is paid for those services and the estate is proportionately depleted, to the prejudice of the general creditors.

There is another and perhaps even more important consideration raised by the assumption by counsel of all major negotiations in connection with the estate. It involves the propriety of permitting counsel to assume the duties of the receiver and/or trustee. Under the statute, it is the receiver or trustee, as the case may be, who has the duty of administering the estate, either by way of operation and reorganization or liquidation, as well as distribution and accounting.[9] Thus, the receiver or trus-

---

general creditors will receive, counsel cannot charge in the same fashion that they do in private cases. *But cf.* the decision of Chief Judge Cancio in In the Matter of Machado, 349 F.Supp. 979 (D.P.R.1972):

We must also point out that the fee determined by a Referee must not be far below ordinary levels in a case of this nature, that if repeated again, it would discourage practitioners from practicing before the Bankruptcy Court.

However, we also note that in evaluating time spent and incorporating it into the amalgam of the fee award, the referee may consider especially difficult work and work performed by especially able and experienced counsel as being worthy of higher compensation than otherwise.

8. 11 U.S.C. § 76 prescribes the receivers' and trustee's statutory commissions.

9. 11 U.S.C. §§ 75, 741.

tee is not only appointed by the Court, but is responsible to it for the administration or liquidation of the estate. Assumption of the receiver's or trustee's duties by counsel would be in derogation of the statutory scheme. Indeed, General Order 44 requires an "officer"[10] to submit to the court an explanation of "the necessity of employing counsel at all." In pre-Chandler Act[11] days there was much criticism of the receiver (albeit one with generally lesser powers) retaining counsel at all.[12]

The considerations and concerns which we have just expressed are ably addressed in *Collier*, where it is stated:

[I]t is still a frequent and probably an unavoidable situation that once counsel is duly retained, be it specially or generally, he is called upon to assist in all kinds of collateral work whose strictly legal character may be open to doubts. Both the receiver and the trustee owe their appointment to their supposedly possessing the requisite fitness, intelligence, experience and business ability. In consideration of their statutory compensation they are expected to render to the estate all services that require no more specialized skill than this ordinary capacity for sound, honest and expeditious business administration. They are, therefore, not entitled to charge the estate for legal services where, for their mere personal convenience, they delegated some of their own duties to lawyers.

"As a general rule an allowance should not be made to a trustee in bankruptcy for compensation for an attorney employed by him for doing such things for the protection and benefit of the estate as do not require professional skill but are well within the ability of a person possessing ordinary intelligence and business capacity. Such things it is

incumbent upon the trustee in the discharge of his duty to attend to without burdening and depleting the estate committed to his charge. The determinative question is not whether it is agreeable and convenient to the trustee to have attorneys to act for him, but whether it is reasonably necessary for the welfare of the estate that counsel should be so employed. This rule, in the absence of special elements of difficulty, has general application with respect to such matters as the payment of taxes, the collection of rents, the payment for water and electricity, and the continuance of insurance in force."

3 Collier § 62.12 at 1476–77, quoting In re Union Dredging Co., 225 F. 188, 194 (D.Del.1915). We believe that the foregoing passages represent an accurate statement of the law.

Consistent with *Collier's* commentary is the opinion of the Second Circuit in In re Mabson Lumber Co., *supra*. Judge Friendly, speaking for the Court, observed:

The referee and the judge were clearly correct in denying compensation for services which did not require legal expertise. The Bankruptcy Act, § 47, contemplates that it is the trustees who shall "collect and reduce to money the property of the estates for which they are trustees" and "examine the bankrupts"; and § 48 sets the maximum allowance the trustees may receive for these services. While General Order 44 permits the bankruptcy court to authorize the trustee to employ an attorney where it is satisfied "that his employment would be to the best interests of the estate," General Order 42 ensures that the mandate of § 72 be respected by providing that "No allowance of compensation shall be made to any attorney for a

10. Under the Act, "officer" includes receivers and trustees, 11 U.S.C. § 61 et seq.

11. The Chandler Act is the popular name given the general revision of the Bankruptcy Act enacted on September 22, 1938.

12. *See* 3 Collier § 62.12, at 1476 n. 38.

* * * trustee * * * except for professional services." Indeed, in a similar case decided by this court thirty-seven years ago, in which the attorney also requested compensation "for arranging for the sale of the assets, * * * collecting accounts due, * * * examining the bankrupt's papers, and more of the sort," Judge Learned Hand went out of his way to dispel "the curious notion," apparently widespread then too, "that an attorney may recover for what are not legal services at all." He pointed out that except for this notion "it would seem scarcely necessary to say that the receiver or trustee, and he alone, can recover for services in collecting the estate," and that while the line between legal and non-legal services "is not always easy to draw, * * * it is there, and referees should draw it straitly, else the estate will be burdened with a duplication of charges." . . . (footnote omitted).[13]

▉▉▉ We also note at this juncture the Report of Proceedings of the Judicial Conference of the United States held on March 30–31, 1967. The Report states (at p. 34):

Recommended that General Orders 42 and 44 be closely observed and no attorney's fee be allowed without an appropriate and detailed fee application which should include professional duties only and should never be based on duties properly performed by a trustee, receiver or other non-professional officer.

The foregoing principles stem from the principle of economy, which dictates that fees not be paid to counsel for performing the duties of the receiver or trustee, for this might unduly deplete the estate to the detriment of the general creditors. While the Third Circuit

has not spoken directly to the issue, we choose to adhere to the General Orders and the prevailing caselaw and hold that, in general, counsel may not recover for non-legal services.

▉▉▉ The foregoing recitations, however, do not conclude this aspect of the case; in a sense, they are merely the prologue. The negotiation of a good bargain for his client is one of a lawyer's principal functions. Much of the average lawyer's time is spent in negotiation of one form or another. Much of the negotiation involved in the present case—for loans, or for sales of assets, for agreements with debtors or creditors of the estate, or with persons proposing a plan of arrangement, may have been so intertwined with legal considerations that it required the intervention, or at least the assistance, of counsel; or it may not have been. The principal problem in this area of the case is that the referee did not develop a record distinguishing negotiations that required the services of counsel from those that did not.

As we have noted above, another significant question raised by Langhorne is whether the services of counsel were necessary in connection with the collection of accounts receivable. This item comprises an important portion of counsel fee. While there is an indication in counsel's memorandum to this Court that some of the accounts were old and had been unsuccessfully pursued by collection agencies, the record in this area is sketchy indeed, and there was no record on this point developed before the referee.

▉▉▉ We do not disagree with the proposition that collection of accounts is a legal service. Indeed, many lawyers devote their entire practices to that endeavor. But, there are instances where the account is not stale, where no de-

---

13. Judge Learned Hand's opinion was in In re Eureka Upholstering Co., 48 F.2d 95 (2d Cir. 1931). In that case, the following services were held to have been non-legal duties to be borne by the receiver: (1) arranging the sale of assets; (2) hiring truckmen; (3) safeguarding property; (4) hiring an accountant; (5) collecting accounts due; (6) inquiring as to equity in accounts; and (7) examining bankrupt's papers.

fense is asserted, and where a strident form letter from a receiver or trustee or from a bookkeeper held over from the debtor's staff and employed by the receiver or trustee, threatening referral to counsel, can be just as effective as a letter from counsel.[14] And, where collection in such simple matters is effected by counsel, he ought to be compensated to a lesser extent than normal.

We note the decision in the case of In re Stern Laboratories, Inc., [1956–1959 Transfer Binder] CCH Bankr.Rep. ¶ 59,589 (1959). There the referee refused to allow the attorneys for the trustee any fee for the writing of collection letters, on the ground that such services were not legal. Counsel had written hundreds of letters and during an eighteen month period collected some $16,000 from 140 debtors without instituting any legal action. The District Court reversed the referee's order on the narrow ground that the claims were not routine (because of a possible breach of warranty defense that might have complicated their collection) and because of the unusual "skill and tact" exercised in the correspondence. The court also referred to the collection letters as having required a great deal of study and finesse. It is not clear from the record whether similar skill was employed in the collection of the accounts here.

█ In sum, it appears that the referee: (1) permitted certain ministerial non-legal services to be taken into account in formulating counsel fee without a finding that it was important that they be performed by counsel; (2) failed to develop a record and make findings as to the extent to which the various negotiations had to be performed by, or required the assistance of, counsel; and (3) failed to develop a record and make findings as to whether the collection of accounts in this case required the efforts of counsel, or as to the degree of difficulty of collection.

Accordingly, the referee's decision is not grounded upon the law applicable to compensation for non-legal services and must be set aside.

D. *The Reference to the Statistical Averages*

Langhorne has asserted that the referee erred in considering the statistical averages published by the Administrative Office of the United States Courts in determining the fees in this matter. In approaching this aspect of the case, it is important first to consider what in fact the referee did do. In his statement accompanying the Certificate of Review, the referee stated:

> One final word: The counsel fees and other costs of administration allowed by the Bankruptcy Court for the Eastern District of Pennsylvania, places our allowances among the lowest of such awards for metropolitan cities in the latest report of the Administrative Office of the United States Courts. The "economical" spirit of the Bankruptcy Act is not to be considered as synonymous with "parsimonious," and it should not exclude a compensation that is, under all the circumstances of a case, fair and reasonable. . . .

It is not altogether clear from this passage that the referee did in fact consider the Administrative Office report in connection with his allowance of fee, although we suspect, from the presence of the quoted passage, that he, in fact, did.

█ There is ample authority for the proposition that statistical averages offer no proper basis for the conclusion that a court may reach in a particular case. In Jacobowitz v. Double Seven Corp., 378 F.2d 405 (9th Cir. 1967), it was said:

> In the first place, the referee in his findings refers to the statistical averages of administrative expense incurred in closing cases generally

---

14. We note that a bankruptcy trustee, though he may be a lawyer, is not required to render legal services, In the Matter of Ira Haupt & Co., 361 F.2d 164 (2d Cir. 1966), but that point is not at issue here.

throughout the United States and finds that costs of closing this estate, even with a reduced fee allowed, exceeds the national average. *To the extent, if any, the court below relied upon this data it would have been in error. Statistical averages may have some value in comparative studies of what courts have done, but they offer no proper basis for a conclusion which a court is about to make.* Attorneys' fees, like other expenses of administration, vary widely, depending upon the circumstances and must be considered and determined on a case by case basis. (emphasis added).

*See also* Meissner Engineers, Inc., Bankrupt v. Thomas, 421 F.2d 12 (7th Cir. 1970). We agree with this authority. And while the fees in each case must therefore be determined on the facts of the case, we do agree that consultation of the averages may operate like the proverbial red flag, and alert the Bankruptcy Court to abuses if they exist. *Cf.* In re Mabson Lumber Co., 394 F.2d 23 (2d Cir. 1968); Meissner Engineers, Inc., *supra*.[15]

For reasons stated earlier in this Opinion, the fee award of the referee must be set aside. In view of the fact that it is not clear that reference to the Administrative Office reports constituted a significant basis for his decision, we do not reverse on that additional ground but have enunciated our view of the law so that it may be taken into consideration on remand.

### VII. *Conclusion*

This Opinion has been directed towards the question of the proper standards to be applied in determining the fees of counsel in Chapter XI and straight bankruptcy matters. Since the standards we have enunciated were not applied by the referee, an additional record must be developed so that a decision in accordance with those standards can be reached. We feel it appropriate that the record be developed by the referee and accordingly, we will remand the matter to him for proceedings, including redetermination of the fee, consistent with the principles set forth in this Opinion.

Before concluding this Opinion, we must add one final note on what we have not decided. Although we have, in the course of enunciating the applicable standards, in effect cast doubt upon the cognizability of certain elements of the counsel fee claim, we have intimated no view as to whether, applying the correct standards to the totality of counsel's labor, the fees awarded by the referee would be sustained, and we are satisfied that the fees will be correctly determined on remand. We are fortunate in this district to have three exceptionally able and industrious referees in whom the entire Court on which we sit has great confidence. However, the confidence of the public and the bar in bankruptcy administration will be buttressed if we forswear the confirmation of fee awards on the basis of the referee's general conclusions or even pronouncements as to reasonableness of counsel's fee but without specific factual findings where necessary, and without reference to, or in derogation of, the proper legal standards as enunciated herein.

---

15. We also note that we can find no authority for justifying a counsel fee on the basis that it represents only a certain percentage of the total estate (this consideration is also mentioned in the referee's certificate), and we disapprove the use of that consideration.