In the Matter of MAY DRUG CO., INC., Bankrupt.

Bankruptcy No. 77–B–1160–16.

United States Bankruptcy Court, E.D. New York.

April 11, 1983.

Randolph Jackson, Brooklyn, N.Y., Baratta & Goldstein, New York City, for receiver.

Norman Klasfeld, New York City, Trustee.

Carl R. Sloan, New York City, for bankrupt.

Jules Teitelbaum, P.C., New York City, for trustee.

MANUEL J. PRICE, Bankruptcy Judge.

The trustee herein, Norman Klasfeld, Esq., has filed his final report and account from which it appears that he has received $10,066.61, has disbursed $1,581.18 and has on hand $8,485.43. The following applications for allowance for fees and commissions have been submitted:

924

A hearing to pass on the final report and account and to consider the applications for commissions and fees was held on February 10, 1983 and was marked submitted.

After almost six years and after two motions made by this court, *sua sponte,* requiring the trustee to file his final report and account or be removed, this run of the mill bankruptcy case involving a retail drug store in the Boro Park section of Brooklyn is finally coming to an end with the result that the applications for commissions and fees exceed the amount of funds in the hands of the trustee. In other words, if I were to allow the fees requested, what will have been accomplished by these proceedings after this inordinate length of time is a liquidation of the bankrupt's assets, not for the benefit of its creditors, but for the benefit, for the most part, of the attorney for the trustee and the cost of this bankruptcy will have "consume[d] the very res the proceedings [were] designed to protect." *In re Mabson Lumber Co., Inc.,* 394 F.2d 23, 25 (2d Cir.1968).

The following is a short summary of the history of this case:

On May 5, 1977, May Drug Co., Inc. (The BANKRUPT), filed a voluntary petition in bankruptcy pursuant to Section 59a of the Bankruptcy Act of 1898, as amended (The ACT), former Title 11 U.S.C. 95a, and it was adjudicated pursuant to Section 18f, former Title 11 U.S.C. § 41f. By order dated May 6, 1977, Randolph Jackson, Esq. was appointed receiver. He qualified by filing a bond in the sum of $10,000 as required by the order and took possession of the assets. He retained the firm of Baratta and Goldstein to act as his attorneys and an order to that effect was signed on May 16, 1977. Pursuant to an application and order submitted by the receiver, Richard S. Cors was appointed appraiser and S. Knitzer and Sons were appointed as auctioneers on May 18, 1977. The sale of the physical assets at the bankrupt's store was scheduled for June 6, 1977.

In the meantime, the first meeting of creditors pursuant to Section 55 of the Act, former Title 11, U.S.C. § 91, was scheduled to be held on May 24, 1977. At the meeting, one Murray Yarin, the bankrupt's secretary-treasurer and fifty per cent stockholder, testified as to its assets and liabilities. Since the schedules filed by the bankrupt and signed and verified by Mr. Yarin listed some $4,500 due it from Medicaid and certain amounts due from other medical plans, he was examined as to charge customers and Medicaid or Blue Cross payments. In response, he testified that he had printouts of Medicaid payments due to the bankrupt (S.M., May 24, 1977, p. 13, 11, 6–17). Norman Klasfeld, Esq. was elected trustee and I granted the application of an associate of the firm which became the attorney for the trustee for an adjournment of the first meeting, *inter alia:*

> "[t]o permit the trustee to collect from the third party debtors, and of the (*sic*) Blue Cross, Blue Shield and various other medical plans."

(S.M., May 24, 1977, p. 14, 11, 17–20).

On May 26, 1977, I signed an order, on the trustee's application, authorizing him to retain Jules Teitelbaum, P.C., as his attorney.

The auction sale of the physical assets took place on June 6, 1977 and realized $3,947.24. After deducting the expenses and auctioneer's commissions, $2,636.06 was turned over to the trustee. Thereafter, through November 16, 1977, he collected $1,879.50 from twenty-seven accounts receivable. On September 22, 1978, the trustee filed an interim report showing that he had on hand $4,358.56. Since it was apparent that no further progress was being made in the case and, since over two years had elapsed since the case was filed, the court, *sua sponte,* on August 8, 1979, brought an order to show cause why the trustee should not file a final report or be removed. On August 20, 1979, he filed his final report and account in which he reported that he had received $5,826.74 (the proceeds of the auction sale and the twenty-seven accounts receivable), had disbursed $1,468.18 and had on hand $4,358.86, the same amount which he had reported almost a year before. Paragraph 2(*1*) of the report stated:

"Caused his attorney to diligently attempt to collect funds from Medicare (*sic*)."

Paragraph 5 stated:

"All the assets of this estate have been reduced to cash and the estate is ready to be closed."

Applications for allowance were filed by the receiver, his attorneys and the attorney for the bankrupt in the same amounts as I have listed on page 1. The trustee requested commissions of $239.80 on $5,826.74 pursuant to section 48c(1) of the Act, former Title 11 U.S.C. § 76c(1). The attorney for the trustee requested $3,700 for a total of $5,067.37 which was over $700 more than the trustee had on hand.

Paragraphs 7, 8 and 9 of the attorney's application for allowance were devoted to his efforts to collect the sum of $4,500 which was due from Medicaid to the bankrupt. In paragraph 9, he states that he was informed by the New York Division of Medical Payments that all monies due the bankrupt had been turned over to the Internal Revenue Service pursuant to two tax liens totaling $13,240.02 and he stated:

"*Accordingly, despite the substantial amount of time that was expended in attempting to recover this receivable, it was apparent that no money would be forthcoming.*" (emphasis mine)

A hearing, on notice to the bankrupt, all creditors and other parties in interest was held on April 22, 1980 to pass on the account and to consider the requests for allowances. The attorney for the bankrupt appeared at the hearing and objected to the trustee's final report on the grounds, *inter alia,* that the trustee should have collected the funds from Medicaid because the Internal Revenue Service liens had been satisfied. He also objected to the amount of Mr. Teitelbaum's fee. (S.M., April 22, 1980, pp. 5–8)

In view of these objections, the hearing was adjourned from time to time and ultimately was marked off the calendar. The attorney for the trustee then commenced an action in the Civil Court of the City of New York against the City of New York, Human Resources Administration, Department of Social Services to recover $4,195.23 which this department had acknowledged was owing to the bankrupt from Medicaid. During the pendency of the action, the defendant offered to settle the action for $3,705.55 and, on February 23, 1981, I signed an order authorizing the trustee to settle and compromise his claim for that amount.

Again, neither the trustee nor his attorney took steps to close this case for four months. Accordingly, on June 22, 1981, this court, *sua sponte,* signed an order to show cause why the trustee should not file a final report or be removed, returnable on August 27, 1981. On that date, I directed the trustee to file his final report and account by September 17, 1981. On October 28, 1981, he filed his second supplemental final report. Thereafter, on August 25, 1982, he made a motion to expunge the claim filed by the Internal Revenue Service returnable on September 23, 1982. After several adjournments, the motion was withdrawn on October 27, 1982. Finally, on January 13, 1983, the trustee filed his amended final report and his attorney filed his amended application for allowance and the hearing thereon was held on February 10, 1983.

I shall now discuss the amount of the commissions and fees to be allowed in this case.

■ The receiver herein, Randolph Jackson, Esq., request commissions on $3,878.84, the proceeds of the auction sale, pursuant to Section 48a(2) of the Act, former Title 11 U.S.C. § 76a(2), in the amount of $117.57. He was a receiver with full powers in accordance with that section and his commission are fixed at the amount requested.

■ Norman Klasfeld, Esq., the trustee, requests commissions on $10,066.61, the total amount which came into his hands, pursuant to Section 48c(1) of the Act, former Title 11 U.S.C. § 76c(1), in the sum of $366.33. Notwithstanding the inordinate delay in completing this case and the fact that two motions were made by this court, *sua sponte,* to remove him for failure to proceed diligently, I will allow his commissions in the amount requested.

■ Carl R. Sloan, Esq., the attorney for the bankrupt, has requested that his fee be fixed at $500. His application is reasonable and his fee is fixed at the amount requested.

■ Baratta and Goldstein, Esqs., the attorneys for the receiver, have requested that their fee be fixed at $500. In addition, they have requested reimbursement for transportation and telephone calls in the sum of $10. They have represented the receiver from shortly after his appointment through the first meeting of creditors. The services rendered included the submission of the order of appraisal and sale and the other services listed in their application for allowance. Their fee is fixed at the amount requested. Their request for reimbursement for local telephone calls and local transportation is denied.

Jules Teitelbaum, P.C. has requested that his fee for the services rendered by him be fixed at $7,500. This request amounts to 75% of the trustee's gross receipts and over 88% of the funds which he has on hand. Let us examine the applications for fees submitted by him in the light of the standards which should be applied in determining what constitutes a reasonable fee for services rendered in bankruptcy proceedings. Under the Act, which governs the services in this case, they were:

1. The time spent;
2. The intricacy of the problems involved;
3. The size of the estate and the amount available for distribution;
4. The opposition encountered;
5. The results achieved;
6. The economic spirit of the Bankruptcy Act to avoid unnecessary expense.

*In re Paramount Merrick, Inc.,* 252 F.2d 482, 485 (2d Cir.1958); *In re Mabson Lumber Co., Inc.,* 394 F.2d 23, 25 (2d Cir.1968).

These standards were expanded under the Bankruptcy Reform Act of 1978 (The CODE), Public Law 95–598, 92 Stat. 2549, which went into effect on October 1, 1979 to include the following:

"1. The nature of services rendered.

\*    \*    \*    \*    \*    \*

2. The difficulties and complexities encountered.

\*    \*    \*    \*    \*    \*

3. The amount of time necessarily expended.

\*    \*    \*    \*    \*    \*

4. The results achieved.

\*    \*    \*    \*    \*    \*

5. The size of the estate and the burden it can safely bear.

\*    \*    \*    \*    \*    \*

6. The duplication of services.

\*    \*    \*    \*    \*    \*

7. The undesireability of the case.

\*    \*    \*    \*    \*    \*

8. Whether the fee was fixed or contingent.

\*    \*    \*    \*    \*    \*

9. The skill requisite to perform the legal services properly; the experience, reputation, and ability of the attorney."

*In re Humbert,* 21 B.R. 489, 493–94 (Bkrtcy. N.D.Ohio 1982).

The first application for allowance submitted by the attorney for the trustee, filed September 4, 1979, which covered the services purportedly performed through that date, asserts that they were "performed on parts of at least 50 days and the performance of said services consumed a total of more than 37 hours" (paragraph 31), evidently at the rate of $100 an hour. What were these services? Were they those that required the skills of sophisticated counsel such as litigation or complex negotiations leading to the recovery of assets to enhance the estate, or did they consist of correspondence, conferences, telephone calls, the preparation of *ex parte* applications and orders and the routine services which require no particular expertise which are typical of the average small bankruptcy case?

The "LOG OF HOURS" attached to the petition for allowance is most informative on that score. It is replete with time spent

on purely routine matters, many of which are not legal services at all but are the function of the trustee. *See In re Eureka Upholstering Co., Inc.,* 48 F.2d 95, 96 (2d Cir.1931). The following are just a few illustrations:

May 25, 1977—one and a-half hours spent on the preparation of the application and order for his own retention and for obtaining the trustee's bond and having it executed;

May 27, 1977—one-half hour spent on correspondence with the postal service to redirect the bankrupt's mail;

June 6, 1977—one-half hour spent on a demand on the receiver for an accounting and the turnover of the bankrupt's books and records (the auction sale was being held on that day and it is hardly likely that the receiver had received any funds from the auctioneer);

October 3 and 6, 1977—one-half hour spent on each day in preparing checks for the payment of the court reporter's bills which had been submitted to the trustee;

December 23, 1977—forty-five minutes spent in answering a status inquiry from a creditor;

April 18, 1978—one-half hour spent on the payment of a premium on the trustee's bond;

September 20, 1978—one-half hour spent on a letter to this court enclosing the trustee's interim report;

October 3, 1978—one hour spent on obtaining an additional bond for the trustee in accordance with a court order;

October 17, 1978—one-half hour spent in forwarding this bond to the court.

It must be remembered that the trustee was requesting a fee of $3,700 for these services in light of the fact that the total amount which had been collected by the receiver and trustee was $5,826.74 and that the trustee had on hand $4,358.86. It must also be remembered that at this point the trustee, on the advice of his attorney, had for all intents and purposes, abandoned the bankrupt's claim of $4,500 against Medicaid.

On January 13, 1983, after the trustee had filed an amended final report and account, which accounted for the collection of $3,705.55 from Medicaid as a result of the action which had belatedly been commenced by his attorney and $534.32 in interest on a certificate of deposit, the attorney for the trustee filed an amended application for allowance in the sum of $7,500. In other words, after the collection of $3,705.55 by means of the action, he requested an *additional* fee for his services of $3,800. Considering this fact, this estate would have been better off if the action had never been brought and the case had been closed at the final meeting which was held on April 22, 1980.

The attorney for the trustee is basing his petition for allowance on the number of hours he purportedly spent on this case and has given no consideration to the other criteria which were ennunciated in *In re Paramount Merrick, Inc., supra, In re Mabson Lumber Co., Inc., supra,* and *In re Humbert, supra.* As the court stated in *In re Hardwick & Magee Co.,* 355 F.Supp. 58 (E.D.Pa. 1973) at page 70:

"... [T]he evaluation of time spent is not merely a matter of reading the ticking meter. The *quality* of the time spent must also be considered, and that includes the questions whether: (1) the services were merely ministerial in nature, ... (2) the services were routine or, on the other hand, required the application of special resourcefulness and skill; and (3) such aspects of counsel's work as involved litigation were opposed or unopposed."

However, the time spent is but *one* of the criteria to be considered in fixing fees in bankruptcy matters. One of the most important of the factors to be considered is the "size of the estate." As my colleague, Judge Goetz, said in the case of *In re Classic Arms International, Ltd.,* 23 B.R. 489, 491–92 (Bkrtcy.E.D.N.Y.1982):

"The Second Circuit said as much in *Rosenberg v. United States,* 242 F.2d 141, 142 (2d Cir.1957), when it approved reductions in allowances made by the District Court, saying:

'Even though these professional services were well-performed and helpful, we think the only realistic course in bankruptcy collections is that allowances must be limited—as they are by customary practice—to a reasonable percentage of the recovery.'

"Even assuming that the entire estate was created by the efforts and ingenuity of counsel, that would not constitute sufficient grounds for awarding them virtually 100 percent of the estate, as they request. Accepting the claim that the estate is due entirely to the efforts of attorneys, *the objective of their efforts is defeated if nothing is left for creditors.*" (emphasis mine)

In the case at bar, three other factors must be given serious consideration, the nature of the services rendered, the difficulties and complexities encountered, and the results achieved. Except for the action belatedly commenced to recover a portion of the Medicaid funds, the attorney for the trustee encountered no difficulties or complexities in this case and the services rendered were routine in nature and were performed with little skill. *See In re International Coins & Currency, Inc.,* 22 B.R. 127, 130 (Bkrtcy.D.Vt.1982). In addition, because of the inordinate time which this case took, it was necessary for the court to move *sua sponte* on two occasions to remove the trustee for his failure to proceed diligently.

Taking into consideration all of the foregoing and all of the criteria ennunciated in the cited cases, the fee of the attorney for the trustee is fixed at $2,750. I have arrived at this figure by allowing him a fee of one-third of the recovery of $3,705 from Medicaid and $1,500 for all of the other routine services in this case.