**In the Matter of REGO CRESCENT CORP., Edward Tymon and Rose Tymon, Debtors.**

**Bankruptcy Nos. 179–03854–16, 179–03855–16 and 179–03856–16.**

United States Bankruptcy Court, E.D. New York.

March 19, 1984.

---

**1002**

Abraham, Silver & Rosenberg, New York City, and I. Louis Winokur, Rego Park, N.Y., for debtors.

Glass & Howard, New York City, for petitioning creditors.

## MEMORANDUM ON ALLOWANCES

MANUEL J. PRICE, Bankruptcy Judge.

After pending for over four years, during which the assets of these debtors have, for the most part, been reduced to cash, these cases are drawing to a close. A liquidating plan has been approved by this court and applications for allowance for fees and expenses have been filed by the attorneys for the debtors, the attorneys for the petitioning creditors, the attorneys for the creditors' committee, the accountants who acted both for the debtors and the creditors' committee and by various members of the creditors' committee. A hearing was held on the allowances on February 2, 1984 and the matter was marked submitted.

In order to put these applications in proper perspective, a short history of the case is appropriate.

Rego Crescent Corp. ("Rego Crescent") was a corporation owned and controlled by Edward and Rose Tymon (the "Tymons") who were husband and wife. It had been for many years in the business of buying, operating and selling real estate, primarily in Queens County. The Tymons financed their business, for the most part, by having Rego Crescent borrow from individuals at interest rates considerably higher than the prime rate in order to attract lenders. The loans were evidenced by promissory notes made by Rego Crescent which were guaranteed by the Tymons. In many instances, the loans were also secured by mortgages on parcels of property owned by the corporation.

For some time prior to September, 1979, Rego Crescent experienced financial difficulty. It was not able to pay New York City real estate taxes which came due on many of the parcels of property which it owned and the city had placed many of them "in rem." On September 12, 1979, Chemical Bank, its largest creditor, obtained a judgment against it and the Tymons for over $620,000 which it docketed as a lien against all real property owned by them.

On December 11, 1979, three creditors of Rego Crescent and the Tymons filed involuntary petitions for relief pursuant to Chapter 7 of the Bankruptcy Reform Act of 1978 (the "Code"), 11 U.S.C. § 303, against them in this court. Rego Crescent and the Tymons (collectively the "debtors") responded by filing petitions for reorganization pursuant to Chapter 11 of the Code, 11 U.S.C. § 301.

I appointed the same committee of unsecured creditors pursuant to section 1102(a)(1) of the Code, 11 U.S.C. § 1102(a)(1), in all three cases and they have been acting as such ever since.

It was clear from the outset that the business of Rego Crescent could not be reorganized. For one thing, the Tymons were both persons of advanced years. As a matter of fact, Edward Tymon died in February, 1981. Both the attorneys for the debtors and the attorneys for the credi-

tors' committee agreed, at the beginning of the cases, that the assets of the debtors should be sold, the mortgages owned by them should be collected, and that these would be liquidating Chapter 11 proceedings.

Rego Crescent continued the operation of its business for this limited purpose. Rose Tymon continued her employment with the corporation, as did Charles Tirelli, its general manager, and Lillian Fischer, its bookkeeper. Both counsel for the debtors and counsel for the creditors' committee predicted that liquidating the debtors in this manner would result in "a 30–35% distribution to general unsecured creditors" *see* petition of Abraham, Silver and Rosenberg, Esqs., counsel for the debtors, for interim compensation dated August 17, 1983, page 4, paragraph 6; application of Glass and Howard, P.C., counsel for the creditors' committee for interim compensation, dated August 4, 1983, page 9, paragraph 35, and page 12, paragraph 43.

Over the course of the last four years, the process of liquidation has taken place. Unsecured creditors, whose claims total $2,574,622, have received no payment whatsoever on their claims. The debtors have cash on hand of $574,363.83; it is anticipated that an additional $242,800 will be collected on mortgages and other assets, for a total of $817,163.83. There is owing some $2,500 for current payroll taxes and $24,575.31 for current real estate taxes, for a total of $27,075.31. Accordingly, there will remain for distribution to unsecured creditors $790,088.52 less the balance claimed for fees and expenses by the attorneys, accountants and members of the creditors' committee.

The following fees and expenses have been requested for services rendered in these cases:

| | |
|---|---|
| Abraham, Silver and Rosenberg, Esqs., | |
| Counsel for the debtors | $164,875.00 |
| Expenses | 2,795.70 |
| I. Louis Winokur, Esq., | |
| Co-counsel for the debtors | 75,930.00 |
| Glass and Howard, P.C., | |
| Counsel for the creditors' committee | 161,810.00 |
| Expenses | $ 6,142.67 |
| Glass and Howard, P.C., | |
| Counsel for petitioning creditors | 1,875.00 |
| Expenses | 215.00 |
| Main Hurdman and Co., | |
| Accountants for the debtors and the creditors' committee | 163,355.00 |
| Expenses | 7,430.00 |
| Miscellaneous expenses requested by members of the creditors' committee | 4,088.93 |
| Total fees and expenses requested | $588,517.30 |

The following interim allowances have been made on account of fees during the course of the liquidation:

| | |
|---|---|
| Abraham, Silver and Rosenberg, Esqs., | $ 80,000.00 |
| I. Louis Winokur, Esq., | 45,000.00 |
| Glass and Howard, P.C. | 85,000.00 |
| Main Hurdman and Co. | 151,300.00 |
| Total | $361,300.00 |
| Total amount requested | 588,517.30 |
| Interim allowances paid | 361,300.00 |
| Balance due if fees and expenses are allowed as requested | $227,217.30 |

To arrive at the amount which will remain for distribution to unsecured creditors, there must be deducted from $790,088.52 the sum of $227,217.30 which leaves $562,871.22. Thus, if the fees and expenses requested are allowed, the attorneys and accountants will receive just about as much as the unsecured creditors who will receive approximately 22 percent on their claims.

The standards to be applied in determining what constitutes a reasonable fee for services rendered in bankruptcy proceedings have been described many times. More than twenty-five years ago, the Court of Appeals for this circuit enunciated them in the case of *In re Paramount Merrick, Inc.*, 252 F.2d 482 (1958) as follows, at page 485:

"The principal factors which enter into a determination of what is reasonable are the time spent, the intricacy of the questions involved, the size of the estate, the opposition encountered, the results obtained...."

More recently, they have been expanded by Bankruptcy Judge Richard L. Speer in

*In re Humbert*, 21 B.R. 489, 493–494 (Bkrtcy.N.D.Ohio 1982) and the cases cited therein as follows:

"1. The nature of services rendered.

\* \* \* \* \* \*

2. The difficulties and complexities encountered.

\* \* \* \* \* \*

3. The amount of time necessarily expended.

\* \* \* \* \* \*

4. The results achieved.

\* \* \* \* \* \*

5. The size of the estate and the burden it can safely bear.

\* \* \* \* \* \*

6. The duplication of services.

\* \* \* \* \* \*

7. The undesirability of the case.

\* \* \* \* \* \*

8. Whether the fee was fixed or contingent.

\* \* \* \* \* \*

9. The skill requisite to perform the legal services properly; the experience, reputation, and ability of the attorney."

The debtors have been represented by co-counsel, Abraham, Silver and Rosenberg, Esqs., (the "Abraham firm") and I. Louis Winokur, Esq. ("Winokur"). Winokur, whose practice was mainly in the field of real estate, had represented the debtors for many years prior to the filing of the petitions. When the involuntary petitions for relief were filed against them, he consulted with the Abraham firm, whose practice was in the field of bankruptcy, for the purpose of retaining it in the bankruptcy proceedings. On January 4, 1980, the debtors submitted an order, pursuant to section 327 of the Code, for the retention of both of them as attorneys for the debtors. I questioned the necessity for co-counsel and I was told that Mr. Winokur was familiar with the real estate aspects of the debtors' business and that he would be concerned with that phase of it. As a matter of fact,

in his petition for an interim allowance, dated January 25, 1982, he stated in paragraph 2 that:

"I. Louis Winokur was assigned the duties of handling all contracts of sale and closing of title with respect to real property owned by the Debtor."

Winokur and the Abraham firm have each submitted an application for allowance setting forth the services which each has performed for the debtors. The Abraham firm has requested a fee of $164,875 for its services, while Winokur has requested $75,930. Thus, the total requested fees for services to the debtors amounts to $240,805.

I shall discuss each of the applications for allowance separately.

The Abraham firm's request for $164,875 is based on the claimed expenditure by it of 843.5 hours on these cases. It claims that a partner of the firm, Jacob W. Abraham, ("JWA") has expended 792.5 hours at the rate of $200 an hour, for a total of $158,500 and that Edward R. Dorney, ("Dorney") who had been an associate of the firm and who had become a partner during the pendency of the cases, has expended 51 hours at the rate of $125 an hour. During the pendency of the cases, several applications for interim allowances were made by the Abraham firm as well as by Winokur and Glass and Howard, (the "Howard firm") which represented the creditors' committee. All of them have submitted lengthy and detailed applications in support thereof as well as in support of their final applications.

The first application for interim compensation of $25,000 was made, on behalf of *both* the Abraham firm and Winokur, to cover all services performed by *both* of them from the inception of the cases through April 3, 1980. I allowed them $20,000 to be divided between them. In addition, I allowed disbursements of $420 to cover the filing fees for the Chapter 11 petitions and $145.97 for external photocopying. These services and disbursements are not included in the applications

for allowance under discussion here since they have been paid for in full.

On February 1, 1982, a second application for an interim allowance was made by the Abraham firm to cover its services from April 4, 1980 through December 30, 1981. It claimed that JWA had expended 342¾ hours of recorded time and fifteen hours of unrecorded time for a total of 357¾ hours and that Dorney had expended 12½ hours of recorded time and 7½ hours of unrecorded time, for a total of twenty hours. It alleged that JWA's billing rate was $150 an hour and that Dorney's was $100. It calculated JWA's services at $53,662.50 and Dorney's at $2,000, for a total of $55,662.50. It requested an interim allowance of 80% of the gross amount, or $44,530, plus $433.39 in expenses. After a hearing, I allowed the Abraham firm an interim allowance of $30,000 and I deferred consideration of the request for expenses.

On August 19, 1983, the Abraham firm filed an application for a third interim allowance. In the application it requested a "further consideration" of the second application which was discussed above on which it had received $30,000, in addition to which it requested an allowance for services which it had rendered subsequent thereto, from December 30, 1981 through August 4, 1983. It alleged that its current billing rate for JWA was $200 an hour and for Dorney, $125 an hour. It then stated that because the former services "were not fully considered" and because its office overhead had increased in the interim, the services described in its prior application should be paid for at its current billing rates rather than at the rates which it had requested in that application.

In other words, it was now requesting that it be compensated retroactively for the 357¾ hours of JWA's time which he purportedly spent on these cases from April 4, 1980 through December 30, 1981, almost two years before, at $200 an hour, rather than at $150 an hour, and that it be compensated for the twenty hours of Dorney's time which he purportedly spent during this period at $125 an hour retroactively

rather than at $100 an hour. It therefore requested that its fee for the services rendered for that period be increased from $55,662.50 to $74,050, a difference of $18,387.50.

The application then alleged that the Abraham firm had spent an additional 292¼ hours on these cases from December 30, 1981 through August 4, 1983 which was broken down as follows:

JWA

| | | |
|---|---|---|
| Recorded time | | 237–¼ hours |
| Unrecorded time | | 25 hours |
| | Total | 262–¼ hours |

Dorney

| | | |
|---|---|---|
| Recorded time | | 20 hours |
| Unrecorded time | | 10 hours |
| | Total | 30 hours |

JWA

262–¼ hours at $200 an hour $52,450

Dorney

| | | |
|---|---|---|
| 30 hours at $125 an hour | | $ 3,750.00 |
| | Total | $56,200.00 |

It also requested reimbursement for expenses for that period of $1,240.46. It then requested that it be allowed $101,923.85 which was broken down as follows:

| | |
|---|---|
| Services rendered from April 3, 1980 through December 19, 1981 | $74,050.00 |
| Expenses | 433.39 |
| Services rendered from December 30, 1981 through August 3, 1983 | 56,200.00 |
| Expenses | 1,240.46 |
| Total | $131,923.85 |
| Second interim allowance | 30,000.00 |
| Balance due | $101,923.85 |

After a hearing, I allowed the Abraham firm an additional interim allowance of $50,000 which left a balance of $51,923.85.

On December 27, 1983 and February 4, 1984 respectively, it filed its final application for allowance and a supplement thereto for services rendered from August 3, 1983 through January 30, 1984. In them, it alleged that JWA had expended 172½ hours of recorded time at $200 an hour and that Dorney had expended one hour of unrecorded time at $125 an hour, for a total of 173½ hours. It requested an additional fee of $34,625 and an additional reimbursement for expenses of $1,121.85. Ac-

cordingly, it requested that it be paid an additional $87,670.70 which it computed as follows:

| Balance remaining on prior applications for interim allowance | $51,923.85 |
|---|---|
| Services rendered from August 3, 1983 to January 30, 1984 | 34,625.00 |
| Expenses | 1,121.85 |
| Total | $87,670.70 |

An examination of the various interim applications for allowance, the final applications and the supplement submitted by the Abraham firm reveals that many of the services for which reimbursement is sought at $200 an hour for JWA's services consisted of conferences, telephone calls, research, correspondence, the examinations of claims filed by creditors, the re-examinations of contracts for the sale of real estate prepared by Winokur, the preparation of *pro forma* orders authorizing the sale of parcels of real estate and other routine services of this nature which required no special expertise. Typical of these is the following description of fourteen hours of services performed by JWA contained in the second interim petition for allowance filed on February 1, 1982 at Schedule "A," pages xix, xxxvi:

"August 4, 1980

Wrote letter to Robert L. Howard showing why the case should remain in Chapter 11, not under Chapter 7. 2 hrs.

\* \* \*

"February 6, 1981

Spent 5 hrs. going over the register of proofs of claim and the proofs of claim filed in Bankruptcy Court and making notes with respect to observations concerning those proofs of claim, which observations have been furnished to us by Mrs. Fischer, of the debtor corporation. 5 hrs.

"February 9, 1981

Spent additional time at the office continuing the examination of documentation with respect to claims filed, and then decided it was necessary to go to the Bankruptcy Court to continue the examination of the original proofs of claim. Spent a total of 7 hours reviewing the claims, both at the office and at the Court, and in dictating the notice of motion and form of application to objection to claims filed. 7 hrs."

With regard to the entry of August 4, 1980, I am at a loss to understand why it was necessary for JWA to spend two hours, or indeed any time at all, in writing a letter to the attorney for the creditors' committee explaining why the cases should remain in Chapter 11 rather than be reconverted to Chapter 7. At this point, the cases had been pending for eight months during which, according to the application for an interim allowance submitted by the Howard firm on February 2, 1982, it had been monitoring them on almost a daily basis.

As to the entries of February 6 and 9, 1981, the examination of proofs of claim is ordinarily the function of a clerk or a paralegal whose billing rate is a fraction of JWA's. If it needed the skill of someone with more legal training, then Dorney, whose hourly rate is about half of JWA's, was available.

So far as Dorney's activities are concerned, many of them consist of the routine services which are normally performed by a law clerk or paralegal such as delivering papers to court, examining files, etc. For instance, Schedule "A" attached to the application for interim compensation filed on February 1, 1982 contains the following entries:

"April 17, 1980

Prepared Order for authorization to enter into contract with David Movtady. Sent Edward R. Dorney to Robert L. Howard's office to obtain his written consent, and then to Judge Price's chambers to deliver Order.

| | |
|---|---|
| Edward R. Dorney | 1 hr. |
| Jacob W. Abraham | ½ hr. |

Submitted to Court receipts and disbursements schedule from 3/17/80 to 4/11/80. Gave copy to Robert L. Howard.

| | |
|---|---|
| Dorney: | 1 hr." |

Also, Schedule "A" attached to the application for interim allowance filed on August 19, 1983 has this entry for four hours of his services:

"January 22, 1982

Edward R. Dorney went to the Eastern District Court in connection with submission of an application for interim allowances ascertain whether any appearance had been filed by any attorneys to whom notice of our application would be required

to be forwarded. Examined the entire file and the matrix. No such appearances were found. On returning to the office, however, and after conferring with Robert L. Howard, Esq., it was determined that there had been creditors filing proofs of claim, who are not as yet listed in the Court's matrix of interested parties. Thereafter, Mr. Dorney went back to the Courthouse and made a photocopy of both the matrix and the claims docketed and collated same to determine how many additional creditors were to be added to the matrix prior to the mailing out of notice.

| JWA: | 1 hr. |
| ERD: | 4 hrs." |

The applications for allowance contain a record of innumerable telephone conversations engaged in by JWA. Strangely enough, not one of them was recorded at less than one quarter of an hour. Nor was any letter dictated by him in less than that time. In Schedule "A" of the application for allowance filed on December 22, 1983, the Abraham firm lists some twenty hours spent by JWA in the preparation of the petitions for allowance on August 8, 9, 10, 15, 16 and December 21, 1983. At the billing rate requested for him, creditors are expected to pay $4,000 for these services.

As stated above, the Abraham firm bases its application for allowance on the time which JWA and Dorney purportedly spent on the cases, irrespective of the nature of the services rendered by them. Concededly, the time spent is one of the relevant factors to be considered in fixing the amount of its fee. *Levin & Weintraub v. Rosenberg,* 330 F.2d 98, 100 (2d Cir.1964) *cert. denied,* 379 U.S. 833, 85 S.Ct. 64, 13 L.Ed.2d 41 (1964). As a matter of fact, it has been labeled as a "prime consideration" in this regard. *In re Hardwick & Magee Co.,* 355 F.Supp. 58, 67 (E.D.Pa.1973). However, that court observed, at page 70:

"[T]he evaluation of time spent is not merely a matter of reading the ticking meter. The *quality* of the time spent must also be considered, and that includes the questions whether: (1) the services were merely ministerial in nature, ... (2) the services were routine or, on the other hand, required the application of special resourcefulness and skill; and

(3) such aspects of counsel's work as involved litigation were opposed or unopposed." (original emphasis)

My colleague, Judge Conrad B. Duberstein, had occasion to comment on the compensation to be allowed for "less important services" as follows:

"They [the attorneys] should not be compensated at the maximum billing rate for the time spent in the performance of less important services.

\* \* \* \* \* \*

"In arriving at a fair hourly billing rate for all of the routine and ministerial services rendered by the attorneys, a lower billing rate should be applied than the rate for rendering legal services that require a greater degree of judicial [sic] expertise. *In re Northcross v. Board of Education,* 611 F.2d 624, *cert. denied,* 447 U.S. 911 [100 S.Ct. 2999, 64 L.Ed.2d 862] (1980); *In the Matter of Hamilton Hardware Co., Inc.* 8 B.C.D. 967, 4 C.B. C.2d 699, 11 B.R. 326 (E.D.Mich.1981)" *Marine Midland Bank v. Grandview Dairy, Inc., (In re Grandview Dairy, Inc.)* Bankr. No. 179–03641–240A, Adv. Proceeding No. 180–0110–260A (B.C.E.D.N.Y.1982), at pp. 7–8.

In my opinion, the rates of compensation requested by the Abraham firm for the kinds of services rendered in these cases are excessive. Judge Thomas C. Platt of the District Court for the Eastern District of New York commented upon a situation such as this one in reducing the fee of the attorney for the trustee from $150 an hour, fixed by my colleague, Judge Cecelia H. Goetz, to $100 an hour, in a hotly contested action in which the attorney for the trustee was successful in setting aside fraudulent transfers. Judge Platt stated:

"There is no challenge to the affidavit of the trustee's attorney, Mr. Herzog, wherein he indicates an expenditure of 239.90 hours.

"Mr. Herzog sought compensation at the rate of $250.00 per hour. The bankruptcy judge reduced the rate to $150.00 per

hour. She noted in her opinion of February 19, 1981, that $100 per hour is close to the minimum currently being charged by experienced attorneys in 'this geographic area.' She then made allowance for Mr. Herzog's 'skill, experience, and professional standing.' We believe that the judge's description of Mr. Herzog's skills and the difficulties presented by this case is not in issue. What is questioned here is the valuation of his services and the problems presented by this case. In balance, we believe a $100.00 per hour figure is commensurate with prevailing rates and affords adequate compensation to Mr. Herzog. Compare, *Selzer v. Berkowitz*, 477 F.Supp. 686 (E.D.N.Y.1979), *vacated on other grounds and remanded sub nom. Selzer v. Fleisher*, 629 F.2d 809 (2d Cir. 1980), *cert. denied*, 451 U.S. 970, 101 S.Ct. 2046, 68 L.Ed.2d 348 (1981). As we see it, in matters of this type there should be no extra compensation for particular skills and difficulties unless the latter be truly exceptional which is not the case here. Thus we find that the award of $40,000 in attorneys' fees is arbitrarily excessive and we hereby reduce the award to $24,000."

*In re Checkmate Stereo & Electronics, Ltd.*, 21 B.R. 402, 413 (D.C.E.D.N.Y.1982).

In computing its application for fees, the Abraham firm has requested that all of the services rendered by JWA be compensated at $200 an hour irrespective of the fact that in its second application for an interim allowance it requested that 357¾ hours of services rendered by him from April 3, 1980 through December 29, 1981 be compensated at $150 an hour. I see no basis for this increase in hourly rates for him. To quote Judge Platt, "[t]here should be no extra compensation for particular skills and difficulties unless the latter be truly exceptional" which is not the case here. In my opinion, an hourly rate for JWA of $150 is generous for all of his services in these cases.

The applications for allowance list the following time spent by him in the performance of the services covered thereby:

| Recorded time | 752½ hours |
|---|---|
| Unrecorded time | 40 hours |
| Total | 792½ hours |

■ I shall disallow compensation for the purported unrecorded time requested for the reason that the applications for allowance record each letter, telephone call, conference, meeting, discussion and court appearance in detail. I do not believe that there was any expenditure of unrecorded time by either JWA or Dorney. Included in the recorded time are the twenty hours for the preparation of the applications for allowance. There is a serious dispute as to whether *any* allowance may be made for the time spent in the preparation of applications for allowance. (*Compare In re Liberal Market*, 24 B.R. 653, 661 (Bkrtcy.S.D. Ohio 1982) in which the court held that the preparation of an application for allowance is an expense of doing business and *Rose Pass Mines, Inc. v. Howard*, 615 F.2d 1088, 1093 (5th Cir.1980) which held that since attorneys are required "to file a detailed account of [their] legal services" they should be granted reasonable compensation at lower than regular rates.) I will allow the twenty hours for the preparation of the applications for allowance at $50 an hour, or $1,000 for these services.

Accordingly, compensation for JWA's services will be allowed as follows:

| 732½ hours at $150 an hour | $109,875.00 |
|---|---|
| 20 hours at $50 an hour | 1,000.00 |
| | $110,875.00 |

As to Dorney's services, it is my opinion they are reasonably worth no more than $85 an hour. I have computed the number of hours spent by him as follows:

| Recorded time | 32½ hours |
|---|---|
| Unrecorded time | 18½ hours |
| Total | 51 hours |

For him, too, I shall disallow the request for unrecorded time for the reasons given

above and therefore fix the compensation for Dorney's services as follows:

| | |
|---|---|
| 32½ hours at $85 an hour | $2,762.50 |

Accordingly, the fee for the services performed by the Abraham firm is fixed as follows:

| | | |
|---|---|---|
| JWA's services | | $110,875.00 |
| Dorney's services | | 2,762.50 |
| | Total | $113,637.50 |
| | Interim allowances | 80,000.00 |
| | Balance due | $ 33,637.50 |

In addition to the fee requested for its services, the Abraham firm has asked that it be reimbursed for $2,795.50 in expenses. These cover postage, photocopying, messenger service, transportation to and from court, etc., telephone calls, court fees and undocumented and miscellaneous expenses. The major portion of these expenses consisted of photocopying performed on its own machine. A request was made to me at the beginning of the cases for reimbursement at twenty-five cents a page by JWA. Improvidently, I granted the request. Upon realization of the gross excessiveness of this charge (the public photocopying machines at the court charge ten cents a page), I lowered it to ten cents a page which, on reflection, I still deem excessive for in-house photocopying.

 In my opinion, all of these expenses, with the exception of long distance telephone calls and court fees, are part of the overhead of a law office and are not reimbursable since lawyers are not retained on a cost plus basis. However, in view of my improvidence, I will allow the Abraham firm $500 for photocopying which, at five cents a page, will pay for photocopying 10,000 pages. Accordingly, the following expenses will be allowed:

| | |
|---|---|
| Photocopying | $500.00 |
| Long distance telephone calls | 5.30 |
| Clerk's fees | 180.00 |
| Total | $685.30 |

Abraham, Silver and Rosenberg, Esqs. will be allowed $34,322.80, which represents the balance due it on its application for payment of its fee and expenses.

I shall now consider the request for an allowance of $75,930 submitted by I. Louis Winokur, Esq., as co-counsel to the debtors. In my discussion on his retention as co-counsel with the Abraham firm, I referred to the fact that he was retained to deal with the real estate aspects of these cases while the Abraham firm's responsibility would be the other phases of them. It would be he who would render services relating to the disposition of the parcels of real estate owned by the debtors.

In the petition for an interim allowance submitted by him on February 1, 1982, he described what compensation he requested in connection with the sales of the debtors' real property and what the services consisted of as follows:

"7. The fair and reasonable compensation for contracts and titles in connection with real properties is based upon usual and customary fees measured by the selling prices of each property. The reasonable and fair compensation for such services is 1% of the selling prices, with a minimum of $350.00 for each contract and title, where the selling prices are less than $35,000.00.

"8. With respect to each such contract of sale and title closing, the services of the Petitioner consisted of negotiation for and preparation of executory contracts for the sale of real property, *furnishing the necessary information to the unsecured creditors' committee to give the committee the information required to approve the contract*, arranging for redemption of real properties from the City of New York which in many cases had already acquired title to such real properties by virtue of *in rem* foreclosure proceedings, clearing of title questions which arose when title searches were received, arranging for discharge of mortgages and other liens which affected the real properties, preparation for all necessary papers to effectuate title closings, attendance at title closings, and all other services of any kind or

nature relating to title closings. Services also involved preparation of closing statements with respect to each and every title closing.

"9. *The services in this case involved much more than is usually required for contracts and titles because of the necessity of obtaining Court approval, redeeming properties from the City of New York, negotiations with mortgagees and lienors, analysis of each and every property to ascertain that the selling pices [sic] were fair and reasonable, etc.*

"10. *Petitioner nevertheless seeks no additional compensation with respect to such unusual efforts but because of his committment in open Court when the question arose, Petitioner is limiting his compensation to the 1% base and to the minimum of $350.00 for any one contract.*" (emphasis supplied).

Attached to that petition was "EXHIBIT A" which enumerated some fifty-one pieces of property which were sold by the debtors from March 3, 1980 through January 7, 1982 for which Mr. Winokur requested a fee of $38,955 based upon the one percent formula described above. After a hearing, I allowed him $20,000 on account of those services.

On August 23, 1983, Winokur submitted another application for interim compensation. Attached to his petition as "EXHIBIT A" was the list of the fifty-one title closings which had been attached to his prior application for an interim allowance which I have described above. Also attached to it were "EXHIBIT B" and "EXHIBIT C." Exhibit B consisted of a list of twenty-four additional title closings which had taken place between February 18, 1982 and July 23, 1983 for which he was requesting $13,375, again, based upon the one percent formula. "Exhibit C" consisted of a brief description of other services purportedly performed by Mr. Winokur between February 1, 1980 and June 8, 1983 which, he claimed, consumed 125¼ hours of his time for which he was seeking payment at the rate of $150 an hour, or $18,787.50. He

therefore requested an additional interim allowance of $51,117.50 as follows:

| | |
|---|---|
| Exhibit A (title closings) | $38,955.00 |
| Exhibit B (title closings) | 13,375.00 |
| Exhibit C (125¼ hours at $150 an hour) | 18,787.50 |
| Total | $71,117.50 |
| Interim allowance | $20,000.00 |
| Balance requested | $51,117.50 |

After a hearing, I allowed him an additional interim allowance of $25,000 which left a balance of $26,117.50.

On December 20, 1983 and February 2, 1984, respectively, Winokur submitted a final application for allowance and a supplement in which he listed two additional title closings for which he requested $1,100 pursuant to the one percent formula. He also claimed that he had rendered 24¾ hours of additional service from August 20, 1983 to February 8, 1984 at $150 an hour for an additional $3,712.50. Included in this application were eight hours of time spent on the preparation of his applications for allowance at $150 an hour, or $1,200. He requested an additional allowance of $30,930 which he computed as follows:

| | |
|---|---|
| Balance due on prior requests for interim allowance | $26,117.50 |
| Additional title closings | 1,100.00 |
| 24¼ hours of additional services at $150 an hour | 3,712.50 |
| Total | $30,930.00 |

Mr. Winokur's application for an allowance of $75,930 can be broken down into two segments. The first concerns itself with the seventy-seven title closings for which he has requested $53,430 based upon the one percent formula. The second with the so-called additional 150 hours of services for which he is requesting an additional $22,500. So far as the title closings are concerned, there is no question but that he performed these services. They were required in order to liquidate the debtors' assets and the fee requested is that customarily charged in matters of this kind. His request for payment of $53,430 is granted.

I have some questions, however, as to his request for the so-called "additional services." Of the 150 hours allegedly spent thereon, almost half, some 74½ hours were purportedly spent by him in attending the creditors' committee meetings. The debtors were represented at each of these meetings by JWA of the Abraham firm and I can see no reason for the double representation. If it is Winokur's contention that his presence was necessary to explain the closings, I must remind him that in his petition for an interim allowance, dated January 25, 1982, he stated, in paragraph 8, that his services in connection with the closings on which he was receiving one percent would include "furnishing the necessary information to the unsecured creditors' committee to give the committee the information necessary to approve the contract[s]."

An examination of the other services reveals that many of them consisted of conferences, telephone calls (again, none of which were recorded at less than fifteen minutes), meetings, letters and eight hours spent in the preparation of his applications for allowance. My comments concerning activities of this kind contained in my discussion of the Abraham firm's application for fees is pertinent here. In my opinion, a fee of $100 an hour for the kinds of "additional services" performed by Mr. Winokur is more than adequate. However, in conformity with the ruling in the *Rose Pass Mines* case, *supra,* I will allow $50 an hour for time spent in the preparation of his petitions for allowance.

The fee of I. Louis Winokur, Esq. is fixed as follows:

| | |
|---|---|
| For title closings | $53,430.00 |
| For 142 hours of "additional services at $100 an hour | 14,200.00 |
| For 8 hours spent in preparation of petition for allowance at $50 an hour | 400.00 |
| Total | $68,030.00 |
| Interim allowance | 45,000.00 |
| Balance | $23,030.00 |

Glass and Howard, Esqs., the attorneys for the petitioning creditors who were also retained as attorneys for the unsecured creditors' committee, have submitted applications for allowance for their services in both capacities.

I shall first consider their application for an allowance of $1,875 for their services as attorneys for the petitioning creditors. It is based on the claimed expenditure of twelve and one-half hours by Robert L. Howard ("RLH") at his billing rate of $150 an hour. According to the application, he met the three petitioning creditors and their attorney, Ronald Kahn, Esq., on November 30, 1979, after which they met with the debtors' attorneys and the attorneys for Chemical Bank at the offices of Chemical's attorneys. According to the description of services attached to the application, this meeting lasted two and a half hours. I must assume that the debtors' financial condition was discussed at the meeting as well as the position of Chemical Bank which had obtained a judgment against them for over $620,000. Thereafter, on December 3, 1979, RLH did one-half hour of "research" and, on December 7, 1979, spent two hours on the preparation of the involuntary petitions. On December 11, 1979, he spent four and one-half hours in preparing the involuntary petitions, meeting with the petitioning creditors, presumably to have them sign the petitions, after which he filed them in this court. Thereafter, he made various telephone calls, wrote some letters and then, on January 30, 1980, spent an hour reviewing the file in this court.

I am at a loss to understand why it was necessary for RLH, an experienced bankruptcy lawyer, to do any legal research in this case prior to filing the petition. Section 303 of the Code is simple and clear. If a debtor has twelve or more creditors, any three of them, whose claims aggregate more than $5,000, may file an involuntary petition for relief against it if "the debtor is generally not paying such debtor's debts as such debts become due."

As for the time spent in preparing the involuntary petitions, all RLH had to do was to copy Form No. 9 of the Interim

Bankruptcy Forms appended to the Interim Bankruptcy Rules which were in effect at that time. (It is now Official Form No. 11 appended to the Rules of Bankruptcy Procedure which went into effect on August 1, 1983). This form, which covers about a page and one-half should take less than fifteen minutes to prepare.

In my opinion, the time listed in the description of services is exaggerated. An attorney of Mr. Howard's experience should not have to spend even eight hours on these services. However, I will allow the Howard firm a fee of $1,200 for their services as attorneys for the petitioning creditors.

They have also requested reimbursement of out-of-pocket expenses of $215 consisting of $180 for the filing fee paid to the clerk of this court, $19.50 for photocopying, $12.50 for hand delivery and $3 for travel to the place of business of one of the petitioning creditors. I will allow the reimbursement of the filing fees of $180. All other expenses are disallowed. They are all part of the overhead of operating a law office such as the rent paid, stenographic service, library expenses, stationery, office equipment, etc.

The fee of Glass and Howard as attorneys for the petitioning creditors is fixed at $1,200, plus $180 for reimbursement of out-of-pocket expenses.

The Howard firm has requested that its fee as attorneys for the creditors' committee be fixed at $161,800.50 upon the claimed expenditure of 1048.25 hours on these cases which is broken down as follows:

| Partners: | | |
|---|---|---|
| Robert L. Howard | 465.75 hours at $210 an hour | $97,807.50 |
| James D. Glass | .75 hours at $210 an hour | 157.50 |
| Associates: | .75 hour at $210 an hour | |
| David C. Unger | 115.25 hours at $110 an hour | 12,677.50 |
| Lewis W. Siegel | 123.50 hours at $125 an hour | 15,437.50 |
| Harvey L. Kaminski | 40.75 hours at $120 an hour | 4,890.00 |
| Gayle E. Hanlon | 29.75 hours at $95 an hour | 2,826.75 |
| Jeffrey K. Hass | 12.25 hours at $85 an hour | 1,041.25 |
| Jonathan I. Rabinowitz | 15.50 hours at $130 an hour | 2,015.00 |
| Amos Alter | 141.25 hours at $140 an hour | 19,775.00 |
| Stephen L. Sapienza | 3 hours at $115 an hour | 345.00 |
| Paralegals: | | |
| Ruth A. Antrich | 19.75 hours at $40 an hour | 790.00 |
| Deborah J. Scott | 80.75 hours at $50 an hour | 4,037.50 |
| Total | 1048.25 | $161,800.50 |

In December, 1979, at the inception of these cases, according to the petition for allowance submitted by the Howard firm for its services as attorneys for the petitioning creditors, Mr. Howard's billing rate was $150 an hour. When the firm was retained as attorneys for the creditors' committee in early February, 1980, it had been increased to $175 an hour since that is the billing rate requested for his services in the first application for an interim allowance submitted by his firm on February 2, 1982. In that application, it alleged that it had rendered 523 hours of services from February 1, 1980 to December 22, 1981 for which it requested 80% of $69,915, or $55,932 which was broken down as follows:

| | | |
|---|---|---|
| Robert L. Howard | 222.5 hours at $175 an hour | $38,937.50 |
| David C. Unger | 112.5 hours at $110 an hour | 12,375.00 |
| Lewis W. Siegel | 78.75 hours at $115 an hour | 9,056.25 |
| Harvey L. Kaminski | 35 hours at $105 an hour | 3,675.00 |
| Gayle E. Hanlon | 33.75 hours at $95 an hour | 3,206.25 |
| Jeffrey E. Hass | 11.75 hours at $85 an hour | 998.75 |
| Jonathan L. Rabinowitz | 9 hours at $95 an hour | 855.00 |

| | | |
|---|---|---|
| Amos Alter | .25 hours at | |
| | $125 an hour | 31.25 |
| Ruth A. Antrich | 19.50 hours at | |
| | $40 an hour | 780.00 |
| Total | 523 | $69,915.00 |

In addition to the payment of the interim allowance, the Howard firm requested payment of expenses of $3,197.07. After a hearing, I allowed it an interim allowance of $35,000 and reserved the question of the allowance of expenses until the conclusion of the cases.

On August 19, 1983, it submitted a second application for interim compensation in which it requested reimbursement for 847.-25 hours of services rendered from the date of its retention as attorneys for the creditors' committee through June 30, 1983. It included the 523 hours which it had claimed in the prior application discussed above on which I had allowed it $35,000, plus 324.25 hours from December 22, 1981 through June 30, 1983. It requested that its fee for all of these services be fixed at $132,395 which was broken down as follows:

| | | |
|---|---|---|
| Robert L. Howard | 354.25 hours at | |
| | $210 an hour | $74,392.50 |
| David C. Unger | 115.25 hours at | |
| | $110 an hour | 12,667.50 |
| Lewis W. Siegel | 107.50 hours at | |
| | $125 an hour | 13,437.50 |
| Harvey L. Kaminski | 40.75 hours at | |
| | $120 an hour | 4,890.00 |
| Gayle E. Hanlon | 29.75 hours at | |
| | $95 an hour | 2,826.25 |
| Jeffrey L. Hass | 12.25 hours at | |
| | $85 an hour | 1,041.25 |
| Jonathan I. Rabinowitz | 15.5 hours at | |
| | $130 an hour | 2,015.00 |
| Amos Alter | 141.25 hours at | |
| | $140 an hour | 19,775.00 |
| Ruth A. Antrich | 19.75 hours at | |
| | $40 an hour | 790.00 |
| Deborah J. Scott | 11 hours at $50 | |
| | an hour | 550.00 |
| Total | 847.25 | $132,385.00 |

(There was evidently an error of $10 in addition in the application).

From the foregoing, it is apparent that in its second application for an interim allowance, the Howard firm, as had the Abraham firm, retroactively increased its billing rates for services which it had rendered some two years before for:

RLH from $175 an hour to $210

Lewis W. Siegel from $115 an hour to $125

Harvey L. Kaminski from $105 an hour to $120

Jonathan L. Rabinowitz from $95 an hour to $130

Amos Alter from $125 an hour to $140.

Thus, the request for fees for the period from February 1, 1980 to December 22, 1981 was increased by $9,418.75 retroactively. It deducted the sum of $35,000 which it had received on its first application for an interim allowance and requested that it be allowed a second interim allowance of $97,395.

In addition to this request, it applied for the reimbursement of expenses from February 1, 1980 through June 30, 1983 of $5,205.66.

After a hearing, I allowed it an additional interim allowance of $50,000 and reserved decision on the question of expenses until the conclusion of the cases.

On January 11 and February 1, 1984, respectively, it filed its final application for allowance and a supplement thereto for services rendered through February 1, 1984 which requested that its fee be fixed at $161,800.50. It deducted the $85,000 which it had received in interim compensation and requested that it be paid an additional $76,800.50. It also requested that it be paid $6,142.67 in expenses.

■ I have examined the applications for allowance submitted by the Howard firm as well as the minutes of the meetings of the creditors' committee which it has submitted, and, as I found in the Abraham firm's application, many of the services for which it is requesting compensation for Mr. Howard at $210 an hour, and for the associates at from $85 to $140 an hour are simple, routine, and hardly merit payment at rates which are considerably higher than those charged for comparable services in this area. *See Marine Midland Bank v. Grandview Dairy, Inc., supra* and *In re Checkmate Stereo and Electronics, Ltd., supra.* Many of them consisted of the

preparation of routine applications and orders, particularly for the retention of professionals, the examination and the approval of the orders permitting the sales of the parcels of property on which Winokur had prepared contracts of sale, telephone calls (again, not one of which is listed at less than fifteen minutes), letters (each of which took at least fifteen minutes), reviewing the files, conferences and other services of that nature. RLH acted as secretary of the creditors' committee and as such spent many hours in preparing the minutes of its meetings and the agendas—services which hardly require extraordinary skill or legal ability. The minutes and agendas for each of the meetings consisted of less than five typewritten pages and, in many instances, consisted of less than three pages.

The following are just a few examples of the time spent on the kinds of services listed in the "Description of Services" attached to the Howard firm's application for final allowance which are dated December 29, 1983 and February 1, 1984:

"Robert L. Howard's Services

| Date | Hours | Description of Services |
|---|---|---|
| 2/2/80 | 2 | Telephone conference Swartz, Riber, review file, prepare proposed orders and applications and affidavits to retain attorney for committee, research re: employment of professionals. |
| | | * * * |
| 3/18/80 | 2 | Prepare order and application to employ accountants, telephone call — Swartz, Karras, Abraham, reserach [sic], re: extension of time to redeem. |
| 3/19/80 | 3 | Revise order and application for special bank account for proceeds of sales, telephone call and letter to Abraham, prepare minutes of 3/12 meeting of creditors' committee. |
| | | * * * |
| 7/8/80 | 5 | Prepare minutes of June 6, 1980 creditors' meeting, review proposed contracts and covering letters from Winokur, letter to creditors' committee, re: proposed contracts, telephone calls — Brower, Abraham, Tirelli, Winokur, conference — Kaminski, organize file. |
| | | * * * |
| 9/11/80 | 4 | Review proposed contracts of sale, recent financials, reasons why debtor should stay in 11 by Abraham, prepare agenda for September 17th creditors' committee meeting. |
| | | * * * |
| 10/20/80 | 2–½ | Prepare minutes of September 17th meetings and prepare agenda for 10/22 meeting, reviewed letters from Winokur and Abraham. |
| | | * * * |
| 10/26/80 | 2–½ | Prepare order and appliation [sic] to compensate appraiser, order and application to further retain accountants notice of motion and motion. |
| | | * * * |
| 2/22/81 | 2 | Prepare minutes of January 21, 1981 meeting and agenda for February 25, 1981 meeting [2–½ pages]. |
| | | * * * |
| 3/26/81 | 2 | Conference LWS, prepare minutes of Feb. 25, 1981; meeting and agenda for April 1, 1981 meeting [2–½ pages]. |
| | | * * * |
| 1/16/82 | 6 | Prepare application for interim allowance." |

(an additional fourteen hours are listed for the preparation of applications for allowance on 1/19/82–2 hours; 1/21/82–1 hour; 7/19/83–1–½ hours; 7/30/83–2 hours; 8/2/83–1–½ hours; 12/10/83–4 hours and 1/2/84–2 hours)

"David Unger's Services

| Date | Hours | Description of Services |
|------|-------|-------------------------|
| 10/31/80 | 2 | Memo to Robert L. Howard; telephone call Price's chambers; organize file. |
| 11/06/83 [sic] | 1–½ | Review files. Conference – Robert L. Howard re: Liebman sale. |
| 11/07/83 [sic] | 2–½ | Review files; confer with Robert L. Howard; telephone calls Winoker [sic], Brower, Effress and Laulagian. |

\* \* \*

| | | |
|------|-------|-------------------------|
| 11/11/80 | 2–½ | Telephone call Liebman; review file (re: Farber). |

\* \* \*

| | | |
|------|-------|-------------------------|
| 11/13/80 | 3–¾ | Telephone calls Winoker [sic] & Brower; letter to Brower. |

\* \* \*

| | | |
|------|-------|-------------------------|
| 11/19/80 | 1–½ | Telephone call Bankruptcy Clerk; serve motion — re: salaries. |

\* \* \*

| | | |
|------|-------|-------------------------|
| 12/8/80 | 2–½ | Telephone call and letter Tirelli; telephone call Liebman, Abraham's office; review file. |

\* \* \*

| | | |
|------|-------|-------------------------|
| 12/12/80 | 1–½ | Draft application — re: compensation of appraiser; letter to Brower. |

\* \* \*

| | | |
|------|-------|-------------------------|
| 1/21/81 | 4 | Creditors' committee meeting. (RLH lists 4–½ hours on that day as "prepare for and meet with Rego Creditors' Committee; conference – Unger . . ." the minutes of the meeting show that both RLH and Unger attended this meeting and the time for both of them is being charged. In other words, the Howard firm is charging $1,280 for attending this meeting which was also attended by JWA, Winokur and two accountants from Main Hurdman). |

\* \* \*

"Lewis Siegel's Services

| | | |
|------|-------|-------------------------|
| 02/25/81 | 4 | Attend Creditors' Meeting; review and revise schedules with accountant to Debtor's counsel; conference with Robert L. Howard (RLH lists 3–½ hours on that day as "prepare for and meet with creditors' committee and debtor; conference – Siegel." Here, too, the minutes of the meeting show that both RLH and Siegel attended it together with JWA, Winokur and two accountants from Main Hurdman). |

\* \* \*

| | | |
|------|-------|-------------------------|
| 6/19/81 | 4 | Coordinate mailing of catalogue, take it to printer. Conference – Robert L. Howard re: auction. |

\* \* \*

| | | |
|------|-------|-------------------------|
| 07/20/81 | 1 | Application and order to retain appraiser for Tyman [sic] residents [sic]. |

\* \* \*

| | | |
|------|-------|-------------------------|
| 10/30/81 | 1 | Daley-Hodkin application. |

\* \* \*

| | | |
|------|-------|-------------------------|
| 01/15/82 | 1–¼ | Draft application and order further retaining Main Hurdman. |
| 01/18/82 | 2 | Accountants application and order; application for interim compensation. |

| Date | Hours | Description of Services |
|------|-------|-------------------------|
| 01/19/82 | 4–¼ | Revise accountant's application (.25); interim application hearing (.25); (3); interim application notice revision; conference Robert L. Howard (.75). |
| 01/20/81 [sic] | 1–¾ | Revise application to set hearing and interim application. |
| 1/20/82 | 2–¼ | Application to set hearing to court (1.50); revise application to set hearing (.75). |

* * *

| Date | Hours | Description of Services |
|------|-------|-------------------------|
| 07/08/83 | 3 | Review of records and files. |

"Harvey L. Kaminski

| Date | Hours | Description of Services |
|------|-------|-------------------------|
| 4/19/80 | 1–¾ | Conference — Robert L. Howard, work on order and application for retention of appraiser. |
| 4/21/80 | 3–½ | Work on orders and applications and affidavits to retain and pay appraiser, review debtor's motion to stay city in rem conveyance. |
| 4/28/80 | 1 | Redraft order and application to appoint appraiser. |

* * *

| Date | Hours | Description of Services |
|------|-------|-------------------------|
| 5/2/80 | 1 | Redraft order and application to appoint appraiser. |
| 5/5/80 | 1–½ | Redraft order and application, re: appraiser. |
| 5/6/80 | 2 | Draft order and application for compensation of appraiser. |
| 5/12/80 | 1 | Work on order and application for compensation of appraiser. |
| 5/13/80 | –½ | Conference – Robert L. Howard, re: proposed orders and applications for retention and payment of appraiser. |
| 5/16/80 | 1–½ | Redraft orders and applications re: appraiser. |
| 5/19/80 | 1–½ | Redraft orders and applications re: appraiser." |

According to the description of services, Kaminiski purportedly spent over 15 hours in preparing applications and orders for the retention and payment of an appraiser, services which take no particular expertise and which are ordinarily performed by beginners in the field. The Howard firm is seeking payment at the rate of $120 an hour or $1,800 for these services.

"Gayle Hanlon

| Date | Hours | Description of Services |
|------|-------|-------------------------|
| 07/21/81 | 3 | Review file. |

* * *

| Date | Hours | Description of Services |
|------|-------|-------------------------|
| 07/22/81 | 2 | Review of file. |

* * *

| Date | Hours | Description of Services |
|------|-------|-------------------------|
| 08/13/81 | 1 | Travel time to Glass & Howard. |

"Jeff Hass

| Date | Hours | Description of Services |
|------|-------|-------------------------|
| 03/24/80 | 3–¼ | Meeting with creditors' committee. (RLH lists 3–½ hours on that day as "meeting with creditors' committee and Nat Effress. The minutes of the meeting show that both RLH and Hass attended it together with JWA, Winokur and two accountants from Main Hurdman. Only four members of the committee attended while four attorneys and two accountants attended). |

* * *

| Date | Hours | Description of Services |
|------|-------|-------------------------|
| 3/27/80 | 1–¾ | Attend Adjourned First Meeting. |

* * *

| Date | Hours | Description of Services |
|------|-------|-------------------------|
| 05/01/80 | 1–½ | Attend Adjourned First Meeting. |

* * *

| Date | Hours | Description of Services |
|------|-------|-------------------------|
| 05/16/80 | 2–½ | Attend hearing on Rego v. N.Y.C. |
| | | * * * |
| 6/19/80 | 2 | Attend hearing on Rego v. N.Y.C.; adjourned first meeting; conference – Robert L. Howard." |

(In the description of RLH's services, the entries of 3/27/80, 05/1/80, 05/16/80 and 6/19/80 appear. Evidently Hass accompanied him to these hearings).

"Jonathan I. Rabinowitz

| Date | Hours | Description of Services |
|------|-------|-------------------------|
| 06/23/81 | 2 | Preparation of order for accountant and appraiser. |
| 06/24/81 | 4 | Preparation of orders for compensation, appraiser and accountants. |

"Amos Alter

| | | |
|------|-------|-------------------------|
| 01/27/82 | 3–½ | Reviewing file; research. |
| 02/04/82 | 3 | Pre-trial on subpoena. |
| | | * * * |
| 03/15/82 | 4 | Review of files; preparation for EBT's; telephone conference Lewis W. Siegel. |
| | | * * * |
| 03/17/82 | 5–½ | Review of documents; telephone conference Robert L. Howard; letters." |

It is apparent from the foregoing that many of the services for which the Howard firm is seeking reimbursement are duplicative and that in many instances the time spent was either inordinate for routine services or was exaggerated. In each of its applications for interim allowances and in its final application for allowance, the Howard firm asserts that it is entitled to a premium for the results achieved in these cases and suggests that it consist of allowing it to charge at its current billing rates rather than at its historic billing rates.

The question of allowing "enhanced" or "premium" compensation is discussed in the recent case of *In re Mid-State Oil Co.,* 35 B.R. 441 (Bkrtcy.N.D.1983), in which the attorney for the debtor and the attorney for the creditors' committee, who had received compensation at the rate of $100 an hour, requested an additional premium where the claims of unsecured creditors were paid in full. In commenting on the result the court said, at pages 442 and 443:

"It is, in fact, something that ought to have been accomplished, and it was the duty of the Creditors' Committee and its counsel to see that such occurred. Likewise, the fact that after all the claims have been paid there remains a sizeable residue for the benefit of the corporation shareholders, while an indication of dedicated service by counsel for the Debtor, is not necessarily an unusual result. *The assets were present when the case was initiated.*

* * * * * *

The Court recognizes that both Mr. DeMars and Mr. LeBaron are competent counsel and possess a great deal of expertise in the field of bankruptcy and the fees approved in the Order of December 16, 1982, and prior orders approving interim compensation are fully justified. The Court recognizes, too, that both Mr. DeMars and Mr. LeBaron have performed well for their clients in this Chapter 11 proceeding. The Court finds, however, that both have been adequately

compensated for the services rendered." (emphasis added).

In the cases at bar, I have considered all of the services rendered by the Howard firm and I have also considered the criteria ennunciated in *In re Humbert, supra,* and the cases cited therein. It is my opinion that not only is the Howard firm not entitled to a premium, but that the hourly rates requested by it for its services are excessive. An hourly rate of $150 for RLH's services and for those of James D. Glass is more than adequate. However, I shall allow $50 an hour for the twenty hours RLH spent in the preparation of the applications for allowance. So far as Unger and Siegel are concerned, their hourly rate is fixed at $85 an hour; Kaminski's and Hanlon's is fixed at $70 an hour; Hass's and Rabinowitz's at $65 an hour; Alter's at $100 an hour and Sapienza's at $85 an hour. The hourly rate for the two paralegals, Antrich and Scott is fixed at $40 an hour. Accordingly, the fee for the services rendered by Glass and Howard, P.C. is fixed as follows:

| | |
|---|---|
| Robert L. Howard: | |
| 445.75 hours at $150 an hour | $66,862.50 |
| 20 hours at $50 an hour | 1,000.00 |
| James D. Glass: | |
| .75 hour at $150 an hour | 112.50 |
| (his services consisted of a telephone call to one Seidel and a conference with RLH) | |
| David C. Unger: | |
| 115.25 hours at $85 an hour | 9,796.25 |
| Lewis W. Siegel: | |
| 123.50 hours at $85 an hour | 10,497.50 |
| Harvey L. Kaminski: | |
| 40.75 hours at $70 an hour | 2,852.50 |
| Gayle E. Hanlon: | |
| 29.75 hours at $70 an hour | 2,082.50 |
| Jeffrey K. Hass: | |
| 12.25 hours at $65 an hour | 796.25 |
| Jonathan I. Rabinowitz: | |
| 15.50 hours at $65 an hour | 1,007.50 |
| Amos Alter: | |
| 141.25 hours at $100 an hour | 14,125.00 |
| Stephen L. Sapienza: | |
| 3 hours at $85 an hour | 255.00 |
| Ruth A. Antrich: | |
| 19.75 hours at $40 an hour | 790.00 |
| Deborah J. Scott: | |
| 80.75 hours at $40 an hour | 3,230.00 |
| Total | $113,407.50 |
| Interim allowance | 85,000.00 |
| Balance due | $ 28,407.50 |

The Howard firm has also asked that it be reimbursed for expenses of $6,142.67 which is broken down as follows in the final application for allowance dated December 29, 1983:

| | |
|---|---|
| Travel | $279.16 |
| Toll calls | 33.18 |
| Postage | 200.94 |
| Photocopying (inhouse) | 2,430.94 |
| Photocopying (outside) | 578.13 |
| Overtime meals | 455.64 |
| Messenger service | 975.85 |
| Overtime secretarial | 791.85 |
| Miscellaneous fees (including filing fees, search fees, witness fees) | 228.23 |
| Estimated disbursements for November, December, 1983 and January, 1984 | 168.75 |
| | $6,142.67 |

I shall not allow the following expenses which are part of the overhead of operating a law office.

| | |
|---|---|
| Travel (all local) | $279.16 |
| Postage | 200.94 |
| Photocopying (inhouse) | 2,430.94 |
| Messenger service | 975.85 |
| Estimated disbursements | 168.75 |

█ I shall not allow overtime meals of $455.64 and overtime secretarial service of $791.85. There were no emergencies in these cases which required overtime secretarial service, nor was there any reason for charging overtime meals to these cases. If Mr. Howard, or one of the associates, decided to work on them after business hours, that was their choice and whatever charges were incurred should be absorbed by the firm.

I shall allow the following expenses:

| | |
|---|---|
| Toll calls | $33.18 |
| Photocopying (outside) | 578.13 |
| Miscellaneous fees | 228.23 |
| Total | $839.54 |

█ Main Hurdman, the accountant for both the debtors and the creditors' committee, has submitted affidavits verified on January 10, 1984 and February 1, 1984, respectively, in which it requests that the fee for its services be fixed at $163,355. It has received $151,300 in interim compensa-

tion and requests an additional $12,055 in fees and expenses of $7,480. This firm was retained pursuant to a series of orders which ultimately provided for a maximum fee of $170,000, the exact amount to be fixed upon application to the court.

It bases its application on the following time charges:

| Category | Hours | Rate | Total |
|---|---|---|---|
| Consulting partner | 28 | $125 | $ 3,500.00 |
| Partner | 82 | 100 | 8,200.00 |
| Manager | 543 | 75 | 40,725.00 |
| Senior accountant | 1757 | 50 | 87,850.00 |
| Staff accountant | 577 | 40 | 23,080.00 |
| | | | $163,355.00 |

However, it has not submitted any time records to substantiate its claim that the time was actually spent in the performance of the services which are described generally in its affidavits. It has submitted for my examination various reports, income tax returns, schedules, financial statements and balance sheets without any indication as to how much time it actually spent in preparing them. I am sure that Main Hurdman, a firm which is experienced in this field, is familiar with the importance of submitting time records with its application for allowance. As a matter of fact, it was the accountants for the creditors' committee in the case of *In re Sapolin*, 180–01691–21 (E.D.N.Y.), in which it made application for a fee for its services and about which Judge Goetz, of this court, said:

> "Main [Hurdman] has submitted time records substantiating its claim that at its regular time charges the value of the work performed to date is $141,000.00." (Opinion March 9, 1984, p. 23)

I am also sure that it is aware that the Court of Appeals for this circuit has repeatedly affirmed without qualification the importance of keeping accurate time records and setting them forth in petitions for allowance. *See In re the Wal-Feld Company, Inc.*, 345 F.2d 676, 677 (2d Cir. 1965); *In re Nazareth Fairgrounds and Farmers Market, Inc.*, 374 F.2d 595 (2d Cir.1967).

In the cases at hand, my examination of the minutes of the creditors' committee meetings from February 25, 1980 through November 16, 1983 reveals that out of twenty-five meetings, representatives of Main Hurdman were present at twenty-four. It had *three* representatives George Carras, Anthony Guariglia and David Sorin at the meeting of June 6, 1980 and *two* representatives at the following meetings: February 25, 1980, George Carras and Robert W. Swartz; March 13, 1980, George Carras and William Beatty; September 17, 1980, George Carras and Anthony Guariglia; October 22, 1980, Robert J. Swartz and Anthony Guariglia; December 17, 1980, Anthony Guariglia and David Sorin; January 21, 1981, Anthony Guariglia and David Sorin; March 6, 1981, Anthony Guariglia and David Sorin; September 23, 1981, Anthony Guariglia and Lori Hlawitschke; October 28, 1981, David Sorin and Lori Hlawitschke; December 2, 1981, Anthony Guariglia and David Sorin; September 15, 1982, Anthony Guariglia and Noreen Byrne; September 14, 1983, George Carras and Robert W. Thompson.

I am frankly at a loss to understand why it was necessary to have more than one representative of the accounting firm at fifteen creditors' meetings. In my opinion, at each of the fifteen meetings, the representatives of Main Hurdman were duplicating their services.

If this is typical of the services rendered by Main Hurdman, then the sum of $151,300, which it has received, will amply compensate it for all of its services in these cases and no further allowance will be made.

■ I come now to its request for reimbursement of expenses of $7,480. They are described as follows in its affidavit of February 1, 1984:

> "Out-of-pocket expenses for reproduction, photocopying, travel, messengers, etc., 7,480"

As I have said in this opinion concerning the requests for similar reimbursement by the Abraham firm and the Howard firm, all of these expenses are part of the operation of an office and must be considered part of

its overhead. The hourly rates requested take all of these into consideration and therefore they are disallowed.

Five members of the creditors' committee, Dr. Bernard Becker, Mrs. Sylvia Becker, Mr. Nat Berlant, Mrs. Clara Silberger, and Ms. Lauraine Effress have made application for reimbursement of the expenses incurred by them in attending its meetings. One member of the committee, Mr. Nathan Effress has made application for reimbursement of these expenses in addition to which he seeks reimbursement of a fee which he has paid to an attorney.

 Prior to the adoption of the Rules of Bankruptcy Procedure ("The Rules") on August 1, 1983, there was some question as to whether reimbursement of expenses incurred by individual members of a statutory creditors' committee was authorized under the Code. The question was resolved by Rule 2016(a) which provides:

"A person seeking interim or final compensation for services, or reimbursement of necessary expenses, from the estate shall file with the court an application setting forth a detailed statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested. An application for compensation shall include a statement as to what payments have theretofore been made or promised to the applicant for services rendered or to be rendered in any capacity whatsoever in connection with the case, the source of the compensation so paid or promised, whether any compensation previously received has been shared and whether an agreement or understanding exists between the applicant and any other person for the sharing of compensation received or to be received for services rendered in or in connection with the case, and the particulars of any sharing of compensation or agreement or understanding therefor ..."

The Advisory Committee Note to this rule specifically refers to the expenses incurred by members of a creditors' committee for it states:

"*Subdivision (a)* includes within its provisions *a committee, member thereof,* agent, attorney or accountant for the committee when compensation or reimbursement of expenses is sought from the estate." (emphasis added).

A complete analysis of the cases on this subject, the applicable provisions of the Code and the Rules, was made by Judge Paul W. Glennon in the case of *In re GHR Energy Corp.,* 35 B.R. 539 (Bkrtcy.D.Mass. 1983) in which he allowed the reimbursement of expenses incurred by members of the creditors' committee. I agree with his conclusions and I shall allow reimbursement of the expenses incurred by the members of the creditors' committee in the cases at bar as follows:

Dr. Bernard and Mrs. Sylvia Becker have filed a joint application in which they request $750 for disbursements incurred by them for "parking and gas usage in connection with" their attendance at twenty-five meetings. They allege in their application that they have "incurred expenses of $30 per meeting." Since the address listed for them is in Flushing, Queens, they each must have come to each of the meetings in separate vehicles. Among the dates listed in their application for the attendance by both of them are February 25, 1980, March 24, 1980, June 6, 1980, May 6, 1981 and August 12, 1981. According to the minutes of the meetings submitted by the attorneys for the creditors' committee, only Mrs. Becker is recorded as being present at the meetings on February 25, 1980, March 24, 1980, June 6, 1980 and August 12, 1981. Neither of them is recorded as being present on May 6, 1981. Accordingly, I will disallow any reimbursement for the meeting of May 6, 1981 and will allow reimbursement of $15 for each of the meetings of February 25, 1980, March 24, 1980, June 6, 1980 and August 12, 1981, and I will compute the allowance of their disbursements as follows:

| | |
|---|---|
| 20 meetings at $30 per meeting | $600.00 |
| 4 meetings at $15 per meeting | 60.00 |
| Amount allowed | $660.00 |

Mr. Nat Berlant has requested $65 and it is allowed.

Mrs. Clara Silberger has requested $375 for her attendance at 25 meetings. Among the dates listed in her application is March 24, 1980. The minutes do not record her being present at that meeting. Accordingly, I will allow reimbursement of $360.

Mr. Nathan Effress, one of the petitioning creditors, who is also a member of the creditors' committee, has requested that he be reimbursed for expenses of $2,750 which is broken down as follows in his application dated December 27, 1983:

> "for parking, gas usage, fares and
> taxis in connection with his
> attendance at nineteen meetings of
> the creditors' committee $250.00
> "fee paid for his attorney, Ronald
> Kahn, Esq., in connection with this
> [sic] investigation leading to and
> the filing of the involuntary
> petitions $2500.00
> Total $2750.00"

The sum of $250 for the expense of parking, etc., appears to be reasonable and it is allowed. However, the request for reimbursement for the attorney's fee is disallowed.

According to the involuntary petitions for relief, the petitioning creditors were three members of the Effress family. They were: Nathan Effress, to whom the debtors owed $352,439.32; Lauraine Effress-Krieger to whom they owed $40,482.21 and Corinne Effress to whom they owed $23,191.28 for a total of $416,112.81 based upon promissory notes either made or endorsed by the debtors and interest thereon. Collectively, the Effress family was the debtors' second largest creditor behind Chemical Bank which had obtained a judgment against them for $620,000. As a matter of fact, the involuntary petitions recite Chemical's judgment, and the failure to pay the interest and principal on the Effress family's notes, as evidence of the fact that the debtors were not paying their debts as they became due and thus were the grounds for the granting of the orders for relief pursuant to section 303(h) of the Code.

It is my opinion that Mr. Effress retained Mr. Kahn to protect the interests of his family which was heavily involved financially with the debtors and whose obligations were not being paid. It was evidently at Mr. Kahn's suggestion that RCH was retained, and it was after the November 30, 1979 meeting among him, Mr. Kahn, the debtors' attorneys and Chemical's attorney that Mr. Howard recommended that involuntary petitions for relief pursuant to Chapter 7 of the Code be filed. The Howard firm has made application for an allowance for their services as attorneys for the petitioning creditors and I have allowed them a fee of $1,200. There is no basis for an allowance of an additional $2,500 for Mr. Kahn's services.

Lauraine Effress [Krieger], another member of the creditors' committee has applied for $148.93 as reimbursement for her expenses in attending meetings on seventeen dates enumerated therein. Her application is granted.

To summarize, the final allowances for fees and expenses are fixed as follows:

| Abraham, Silver & Rosenberg, Esqs., | |
|---|---|
| Fee | $113,637.50 |
| Expenses | 685.30 |
| Total | 114,322.80 |
| Interim allowances | 80,000.00 |
| Balance due | $34,322.80 |
| I. Louis Winokur, Esq., | |
| Fee | 68,030.00 |
| Interim allowances | 45,000.00 |
| Balance due | $23,030.00 |
| Glass & Howard, P.C., Attorneys for Petitioning creditors | |
| Fee | 1,200.00 |
| Expenses | 180.00 |
| Balance due | $1,380.00 |
| Glass & Howard, P.C., Attorneys for the Creditors' Committee | |
| Fee | 113,407.50 |
| Expenses | 839.54 |
| Total | 114,247.04 |
| Interim allowances | 85,000.00 |
| Balance due | $29,247.04 |
| Main Hurdman, | |
| Fee | 151,300.00 |
| Expenses | Disallowed |
| Total | $151,300.00 |
| Interim allowance | 151,300.00 |
| Balance | $000,000.00 |

Dr. Bernard Becker and Mrs. Sylvia
Becker

| | |
|---|---|
| Expenses | $660.00 |
| Mr. Nat Berlant | $65.00 |
| Mr. Nathan Effress | $250.00 |
| Ms. Lauraine Effress [Krieger] | $148.93 |

As to the time when the foregoing fees and expenses are to be paid is concerned, the application for allowance, dated December 20, 1983, submitted by Mr. Winokur, contains the request that the "interim compensation" asked for be paid *"prior* to a distribution to creditors as an initial distribution on the debtors' plans." (emphasis added) It is evident that Mr. Winokur has lost sight of the fact that these are not *interim* allowances but are the final allowances in these cases. He has also lost sight of the fact that the liquidation of the debtors' assets was supposedly for the benefit of their creditors and I must point out that the unsecured creditors have received no payment in the four years during which the cases have been pending while the attorneys and accountants have received interim allowances of over $361,000. Accordingly, the fees and expenses provided for herein shall be paid simultaneously with the initial distribution to creditors.

Submit order in conformity herewith.